201 N.J. Super. 258 (1985)
493 A.2d 6
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RICHARD ALAN WANCZYK, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 26, 1985.
Decided March 14, 1985.
*259 Before Judges MICHELS, PETRELLA and BAIME.
Raymond J. Zeltner, Assistant Union County Prosecutor, argued the cause for appellant (John H. Stamler, Union County Prosecutor, attorney; Steven J. Kaflowitz, Assistant Union County Prosecutor, of counsel and on the letter brief).
Joan D. Van Pelt, Assistant Deputy Public Defender, argued the cause for respondent (Joseph H. Rodriguez, Public Defender, attorney; Joan D. Van Pelt, of counsel and on the letter brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
*260 Pursuant to leave granted by this court, the State appeals from an order of the Law Division which granted the motion of defendant Richard Alan Wanczyk to suppress evidence seized following his arrest as well as statements made thereafter while he was in police custody.
Defendant was indicted by the Union County Grand Jury and charged with aggravated arson, a crime of the second degree, in violation of N.J.S.A. 2C:17-1(a)(2), arson, a crime of the third degree, in violation of N.J.S.A. 2C:17-1(b)(2), and threatening to kill a police officer, James Weinberg, a crime of the third degree, in violation of the provisions of N.J.S.A. 2C:12-3(b). Defendant was arraigned on June 25, 1984, at which time an order of arraignment fixing time limitations was entered which provided that "[a]ll pretrial motions, including motions to suppress, shall be filed ... within 14 days of an assignment of counsel." Counsel was assigned to defendant on June 25, 1984. On August 20, 1984, the matter came on for trial. Following the selection of a jury panel, but before the panel was sworn, the trial court held a Miranda hearing. During the course of the Miranda hearing, the defense counsel made a motion to suppress evidence seized in a search following defendant's arrest incident to an investigatory stop by police of a car in which defendant was a passenger. The trial court granted defendant's motion to enlarge the time for making the motion to suppress. We then granted the State's motion for leave to appeal. However, we ruled that the proceedings on the motion to suppress should continue, pointing out that if the motion were granted the trial would be stayed pending appeal.
According to the State's proofs at the suppression hearing, sometime between 10:15 and 10:30 p.m. on May 2, 1984, Officers Weinberg of the Union County Police Department and Todd Brian Turner of the Mountainside Police Department responded in their vehicles to the Watchung Reservation where they found the Airs Barn, a historical landmark located near *261 the Reservation's Trailside Museum, engulfed in flames. Fire apparatus from the Mountainside Fire Department also arrived at about the same time to fight the fire. Weinberg remained at the scene to direct traffic in the parking lot near the fire, and Turner and another officer drove their vehicles around the surrounding area in search of arson suspects or witnesses to the fire. Though the police had not yet formally commenced an arson investigation, Turner testified that he undertook his search because on a prior occasion he had successfully apprehended an arson suspect by searching the area surrounding a fire immediately after its discovery.
While Weinberg was directing traffic, Captain Gerity of the Summit Fire Department approached him. Gerity told Weinberg that he had "seen a possible suspect or witness" leaving the area at the time of the fire and gave Weinberg a detailed description of the individual. Gerity said that he had seen the individual coming from the "loop area" [near the Airs Barn and Trailside Museum] through the woods and that the individual had headed towards the "Summit circle" away from the fire. Weinberg immediately notified headquarters "of the possible witness or suspect" and reported the description the fireman had provided him. Weinberg then left the parking lot in his vehicle and circled the area looking for the possible suspect or witness. A few minutes later he received another report that the individual had been seen entering a brown or tan-colored Chevy with license plate number 591-EIB. Officer Turner also heard the report on his radio, which monitors the County Police Band. The dispatcher at police headquarters subsequently informed the officers that the car was registered to "Mr. Wanczyk" (defendant's father), and that the car had been spotted heading down New Providence Road toward Route 22.
Weinberg immediately proceeded to that area and spotted the car while it was stopped for a red light at the intersection of New Providence Road and Route 22. Weinberg activated his overhead red lights and stopped the car. Turner, who was also patrolling on New Providence Road, saw Weinberg activate his *262 lights and pulled up to the left of the suspect's car to assist Weinberg in the stop. Both officers approached the car, with Weinberg on the passenger side and Turner on the driver's side. Turner testified that the vehicle was driven by an elderly man, defendant's father, who was extremely cooperative when Turner asked him to turn off the vehicle's motor and to show his credentials. However, defendant, who was "sitting low in the backseat in a crouched position, looked very nervous because he kept looking around; he was perspiring very badly." Weinberg asked defendant his name and then requested that he step out of the car. Turner testified that he wanted defendant to get out of the car "because he fit the physical description [of the possible suspect or witness] that [had been] broadcast[ed] on the police radio."
When defendant stepped out of the car the officers had him move toward the rear to avoid the traffic on New Providence Road. As he did so Turner spotted a cylindrically-shaped bulge in the left sleeve of defendant's shirt. Fearing that defendant had a weapon in his possession, the officers took defendant's arms and placed them on the lid of the car's trunk. Turner then retrieved the object which turned out to be a tightly rolled-up "pornographic magazine." Turner, believing defendant might have other objects, such as weapons, concealed in the same fashion as he had concealed the magazine, continued the pat-down search for weapons. Turner explained that:
It seemed a bit peculiar that someone would conceal a magazine in that fashion, and I thought it may be a good idea to continue a pat-down because maybe he might have concealed other objects in that fashion; plus, I was in fear because I didn't know what else he may have there.
As Turner continued the "pat-down," defendant "became extremely abusive" and demanded that the police officer return his magazine. Turner testified that defendant "was cursing, he was moving his arms about in a very irate manner, extremely difficult to control at that point." The police officers tried to calm defendant down by promising him they would return his magazine if "everything checked out" in the "pat-down." Finally, *263 they had to physically restrain defendant against the car's trunk lid, and it became virtually impossible for the officers to continue the pat-down search because of defendant's behavior. Defendant was striking the officers about the upper chest and the head area and spitting at them. Concluding that "enough is enough," the officers placed defendant under arrest for obstruction of justice and read defendant his Miranda rights. In the search of defendant's person incident to that arrest, the officers seized several items, including marijuana seeds, vaseline, a cigarette lighter and matches.
Following the arrest, Weinberg transported defendant to Union County Police Headquarters, where the police filed additional charges against him. While in police custody defendant volunteered certain oral statements and gave an incriminating written statement. At the subsequent Miranda hearing preliminary to his arson trial, the trial court found that defendant had made these statements voluntarily and of his own free will and that the statements were therefore admissible into evidence.
The police also, either that evening or at a subsequent time, took one of defendant's sneakers and gave it to FBI investigators. The FBI matched defendant's sneakers with footprints found near the scene of the Airs Barn fire. The police also gave the sneaker and a T-shirt worn by defendant to the handler of a bloodhound. The dog smelled both and tracked a trail which Wanczyk allegedly used the night of the fire.
At the conclusion of the State's proofs, the trial court found essentially that the officers had a reasonable basis for stopping and detaining the car in which defendant had been riding as a passenger and had a reasonable and articulable suspicion that defendant was armed, thus warranting a pat-down search. However, the trial court concluded that the officers had exceeded the permissible scope of the pat-down search by completing their frisk of defendant's body after seizing the magazine from defendant's sleeve. The trial court found that the officers did *264 not have a basis independent of the bulge in defendant's sleeve to believe that he was armed and dangerous and that after exceeding the permissible scope for the pat-down search the officers had no right to arrest defendant on the charges of obstruction of justice and assault. We disagree and reverse.
There cannot be the slightest doubt on this record that there was an "articulable and reasonable" suspicion necessary to justify an investigatory stop and detention of the car in which defendant was riding. The principles enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny support "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." Michigan v. Summers, 452 U.S. 692, 698, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); State v. Anderson, 198 N.J. Super. 340 (App.Div. 1985). See also, United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). It is the government's interest in effective crime prevention and detection "which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, supra, 392 U.S. at 22, 88 S.Ct. 1868 at 1880, 20 L.Ed.2d 889. See United States v. Place, supra. Since the stop of the car in which defendant was a passenger passed constitutional muster, the officer had the authority to ask defendant to get out of the car. See Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); State v. Nittolo, 194 N.J. Super. 344 (App.Div. 1984).
Once defendant exited the car and the police observed the bulge in the left sleeve of defendant's jacket, the officers unquestionably had the right to conduct a frisk of the defendant under the principles pronounced in Terry v. Ohio, supra. In Terry v. Ohio, supra, the United States Supreme Court placed its imprimatur upon a police officer's limited right to *265 conduct a search for weapons once the officer had reasonably concluded that an individual whom he had legitimately stopped might be armed and presently dangerous. The Supreme Court there established the following standard for ascertaining the entitlement of a police officer to conduct such a limited stop and frisk, stating:
[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.
[392 U.S. at 27, 88 S.Ct. 1868, at 1880, 20 L.Ed.2d 889; citations omitted].
Here, the trial court concluded that the officers had the right to conduct the limited search but that they exceeded the permissible scope of that search because they lacked a reasonable and articulable suspicion that defendant threatened their safety and the safety of others independent of the bulge in the left sleeve. We disagree, based on our view that the initial search was clearly justified under the principles discussed in Terry v. Ohio, supra. Once the officers discovered the magazine, they did not have to stop their search, even though the bulge in defendant's jacket turned out not to be a weapon. As a matter of fact, Officer Turner, who conducted the pat-down search, expressed concern that defendant might have other weapons concealed in the same fashion as the magazine and therefore continued on with the search. In our view it might well have been foolhardy for the officers not to complete the pat-down search. Thus, giving significant recognition to the officer's exposure to the risk of harm in "the sensitive and sensible balancing of constitutional imperatives enunciated by Chief Justice Warren in Terry v. Ohio, supra," State In Interest of H.B., 75 N.J. 243, 252 (1977), we have no hesitancy in concluding that the continuance of the pat-down search after discovery of the magazine passed constitutional muster. In this regard, the language of Chief Justice Hughes in State In Interest of H.B., supra, is most appropriate and worth repeating:

*266 While this Court has not been reticent in going beyond naked constitutional right as defined by the United States Supreme Court, we think we should not so act in the circumstances here. To do so in the face of the violent climate of the times and the universal threat of handguns, particularly to the policeman as he carries out official duties, would seem foolhardy and wrong, and needlessly expose society and the police community to serious risk of death or injury. [75 N.J. at 252].
See also, State v. Kearney, 183 N.J. Super. 13, 18 (App.Div. 1981), certif. den. 89 N.J. 449 (1982).
We are also satisfied that contrary to the trial court's conclusions, the officers had probable cause to arrest defendant for obstructing justice pursuant to N.J.S.A. 2C:29-1. That statute provides:
A person commits a disorderly persons offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act. This section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.
"Probable cause" for an arrest exists where a police officer has a well-founded suspicion or belief of guilt. That suspicion or belief may constitute something less than the proof needed to convict and something more than a raw, unsupported suspicion. State v. Davis, 50 N.J. 16, 23-24 (1967), cert. den. 389 U.S. 1054, 88 S.Ct. 805, 19 L.Ed.2d 852 (1968); State v. Burnett, 42 N.J. 377, 386-387 (1964).
Defendant, by verbally and physically abusing the officers and physically resisting their efforts to complete their "pat-down," purposely impaired the police officers' efforts to perform their official function. Contrary to the trial court's conclusions, the police officers' arrest of defendant did not constitute a mere "pretense" to get the suspect to police headquarters, but rather was based on a well-founded belief that defendant's conduct violated a criminal statute, N.J.S.A. 2C:29-1.
*267 Consequently, we hold that the trial court erred in suppressing the evidence seized following defendant's arrest, including the inculpatory statements made while in police custody.
In view of this holding, we deem it unnecessary to consider and decide the State's claim that the trial court erred by granting defendant leave to file a motion to suppress beyond the time limits set forth in R. 3:5-7 and the order of arraignment fixing time limitations.
Accordingly, the order of suppression is reversed and remanded to the trial court for further proceedings. We do not retain jurisdiction.