**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4008-14T1

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

L.D.,

    Defendant-Respondent.

---

| APPROVED FOR PUBLICATION |
| :---: |
| **January 28, 2016** |
| **APPELLATE DIVISION** |

Argued October 19, 2015 – Decided January 28, 2016

Before Judges Lihotz, Fasciale and Higbee.[1]

On appeal from Superior Court of New Jersey,
Law Division, Burlington County, Indictment
No. 14-06-0086.

Brian J. Uzdavinis, Deputy Attorney General,
argued the cause for appellant (John J.
Hoffman, Acting Attorney General, attorney;
Mr. Uzdavinis, of counsel and on the brief).

James J. Gerrow, Jr., argued the cause for
respondent (Sitzler and Sitzler, attorneys;
Mr. Gerrow, on the brief).

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

---

[1]   Judge Higbee did not participate in oral argument.  She
joins the opinion with counsel's consent.  R. 2:13-2(b).

On our leave granted, the State appeals from a January 22, 2015 order dismissing count two of a Grand Jury indictment, charging defendant L.D. with second-degree speculating or wagering on official action or information, N.J.S.A. 2C:30-3. The State alleged defendant used information he received in his official position as a local government official to purchase farmland for the sole purpose of selling development rights attached to the property to a developer undertaking a project in the municipality.[2]  Defendant moved to dismiss this charge, arguing his actions were based on public information and not confidential facts gained through his official position.  The motion judge agreed and ordered dismissal of count two of the indictment, without prejudice.

On appeal, the State seeks reversal, arguing:

> THE STATE PRESENTED THE GRAND JURY WITH MORE THAN SUFFICIENT EVIDENCE TO SUPPORT A PRIMA FACIE CASE THAT DEFENDANT COMMITTED THE CRIME OF SPECULATING OR WAGERING ON OFFICIAL ACTION OR INFORMATION.[3]

---

[2]  Count one of the indictment charged second-degree official misconduct, N.J.S.A. 2C:30-2(a), relating to defendant's alleged official actions, including voting to adopt township ordinances and planning board resolutions to aid the development, without disclosing his personal relationship with the developer.

[3]  The State also contends the judge improperly made factual findings unsupported by the record.

For the reasons stated in our opinion, we affirm, concluding the record shows the information allegedly used by defendant was neither confidential nor disclosed solely to him. Accordingly, the State failed to produce sufficient evidence before the grand jury to establish a prima facie case that defendant has committed the crime charged. State v. Hogan, 144 N.J. 216, 236 (1996).

These facts, principally found in documentary evidence gathered in an investigation by the Office of the State Comptroller and presented by the State to an Investigative Grand Jury, undergird the charges against defendant. Initially, however, we provide background information necessary to understand the context of the issue presented.

In 2005, the Township,[4] which contained many farms and undeveloped land, participated in a pilot program known as the Burlington County Transfer Development Rights Program. This land management program clustered development in a specified receiving area surrounded by agricultural and open space. The agricultural and open space properties sold "transfer development rights" (TDR), described as "credits," associated with the land to landowners seeking to develop in the receiving

_____

[4]    In accordance with Rule 1:38-3(c)(4), we have omitted identifying information.

area. The number of TDR credits associated with a parcel was based on its size and quality for development. For example, a farmer could sell development rights, thereby preventing the associated land from future development, preserving it as a farm. An owner proposing development of land in the receiving area was required to first amass a specific number of TDR credits, depending on the size and density of its planned building project. The Burlington County Transfer Development Bank Board also owned TDR credits as part of its farmland preservation efforts, which it would sell through auction to facilitate development in the participating municipalities. Overall, the program preserved open space and marshalled residential and commercial development to designated areas of a municipality.

Testifying witnesses before the Investigative Grand Jury included the Chief Operating Officer (the COO) of a real estate development corporation (the developer), which acquired undeveloped land in the Township to construct a multiuse housing and commercial development. The COO discussed the developer's need to acquire a designated number of TDR credits, prior to proceeding with construction. Finally, he explained the developer's interactions with defendant.

In early 2005, while defendant was serving as mayor and a member of the Township Planning Board, the developer contracted to purchase a large undeveloped parcel in the Township's receiving area. In March 2005, prior to closing and in the course of performing due diligence, the developer's COO, accompanied by its owner, met with Township officials, including defendant. They discussed plans for the proposed development and the need for acquisition of the approximately 240 TDR credits for the project to move forward. The developer also engaged a real estate broker to develop leads and assist its efforts in convincing farmers to sell available TDR credits. The developer closed on the property in May 2005.

The COO next recited the developer's unsuccessful efforts to acquire TDR credits. The developer had approached "a handful of large credit owners," expressing a willingness to pay more per credit for large blocks of TDR credits. In October 2005, the developer issued a mailing to approximately thirty or forty entities, which disclosed its TDR credit needs and offered to pay $55,000 to $60,000 per credit, depending on the terms of the transaction, which was a price "10 to 20 percent more than anyone had ever offered . . . ." The developer also "assumed that in the farming community everyone tends to know each other" and believed if one farmer was engaged, he or she could convince

others to join. The COO testified the response to the developer's mailing inquiry was "terrible," consisting of two or three potential sellers, who had few credits and asked nearly twice the offering price. This lackluster response concerned the developer, which faced the prospect of being unable to develop its property.

Defendant, as mayor, periodically inquired regarding the status of the developer's credit acquisition and, in March 2006, the COO personally told him of the "dismal" response to its efforts. Defendant, knowing the developer's difficulty, approached the COO and suggested he intended to purchase a roughly 100-acre parcel (the farm), adjacent to his home, and wanted to sell the developer the associated TDR credits for $65,000 per credit.

On May 3, 2006, defendant executed a contract with the developer, through its subsidiary, to transfer all TDR credits associated with the farm.[5] The developer agreed to buy the parcel's TDR credits for $65,000 per credit. The contract terms also provided defendant a $150,000 non-refundable deposit and gave him the right to file an appeal to increase the designated

---

[5] We are aware defendant and his wife were the designated purchasers of the property and the named sellers of the TDR credits to the developer. In our opinion, for clarity, we have omitted specific references to defendant's wife.

TDR credit allotment associated with the farm. If successful in this effort, a contingency clause provided the price per credit would be increased to $70,000. Finally, unlike its other agreements to purchase TDR credits, the developer's contract with defendant included a clause prohibiting its recording as a public record.

Thereafter, defendant applied to increase the TDR credits associated with the farm, from approximately twenty-six to thirty-six. In his application, defendant did not disclose his contract with the developer to sell the TDR credits associated with the farm. One month later, the Township Planning Board approved the application. On July 12, 2006, defendant completed the $2 million purchase, taking title to the farm.

On August 9, 2006, Burlington County Land Use Office officials were invited to participate in a Township Committee meeting. During that meeting, defendant urged the County to sell its TDR credits to the developer to allow the proposed developer to move forward. Thereafter, on September 6, 2006, defendant, on behalf of the Township Committee, accompanied the developer's officers to present a similar proposal to the County Transfer Development Bank Board. Ultimately, in 2007, the County held a public auction of TDR credits. The developer purchased thirty TDR credits during that sale.

In April 2007, defendant introduced and voted on a resolution to present Ordinance 2007-9 to the Township Planning Board, designed to decrease the requisite TDR credits for proposed residential development in the Township. The Ordinance was adopted by the Township Committee on April 26, 2007; its adoption was moved by defendant, who also voted on its passage. At that time, the developer was the primary active developer in the Township, which would benefit from the Ordinance. Defendant did not disclose his acquisition of the farm or his plan to sell associated TDR credits to the developer. In the ensuing months through April 2008, defendant participated in and voted on other ordinances directly affecting the development.[6] He also privately corresponded with the developer suggesting it draft a letter to other Township officials disclosing the difficulties and asking for assistance to advance the proposed development. At no time did defendant disclose his association.

Finally, on the Local Government Ethics Law Disclosure Statements filed by defendant, he did not include his transaction with the developer and its related entities, despite

---

[6] On April 12, 2008, defendant was disqualified from participating in any planning board actions regarding the development because he had participated in and advocated issues during discussions regarding the development's required TDRs.

receipt of the deposit, a net profit upon sale of the credits, and interim mortgage payments.

Defendant was later indicted. He moved to dismiss both charges, challenging the quantum of the State's evidence. Specifically, regarding the crime of second-degree speculating or wagering on official action or information, defendant argued information he used was public information, not confidential disclosures learned in his official capacity. The State responded, arguing although the public was aware the developer sought to purchase a large amount of TDR credits, defendant, while acting in his official capacity, additionally learned the developer experienced extreme difficulty in acquiring TDR credits. Knowing the lack of TDR credits could scuttle the development, the State argued defendant used this "non-public information" to proceed to negotiate a personal deal with the developer to sell credits associated with the farm.

The motion judge denied the request to dismiss count one, and reserved her decision with respect to count two. In a supplemental written opinion, the judge granted defendant's motion to dismiss count two, without prejudice. She determined the developer publicly told Township officials in March 2005 of its perceived difficulty to amass the required credits, announced its intention, and engaged in solicitation efforts to

purchase 240 TDR credits. She noted the developer "had already reached out to . . . a lifetime farmer and licensed real estate broker, in 2005, to approach other farmers and large landowners to try to encourage them to sell their credits . . . . and by early 2006 all of the public gestures had been made." Further, the judge found "all the farmers in town, including [defendant], knew each other and would have talked regularly as early as 2005, and by late 2005 [the developer] had already sent a mass mailer."

On the State's motion for reconsideration, it analogized defendant's conduct to insider-trading, where a seller's position is strengthened by knowledge an ordinary buyer could not obtain elsewhere. The State suggested "the non-public information to which defendant had access through his official capacity was not that [the developer] was looking for credits, but it was the mindset with which [the developer] was looking for credits." The State emphasized the degree of the developer's desperation was "a matter of factual resolution for a jury[.]"

The judge disagreed. Noting everyone knew of the significant number of credits the developer needed to advance its project, she found knowledge of the lackluster response to the developer's public efforts was very subjective and too

"nuanced" a point to support the change, stating "the only way you can analyze degrees of want or need is through subjective analysis . . . ." Further, she noted Township farmers would have been well-informed about the developer's difficulties. For example, the realtor hired by the developer was a farmer and knew of the difficulties. In fact, the realtor first attempted to purchase the farm defendant successfully bought. The judge concluded the facts did not support a prima facie case under the statute. The judge dismissed the charge without prejudice and stayed the determination pending the State's application for interlocutory review. We granted the State's motion for leave to appeal.

Our Supreme Court "has recognized the grand jury's independence and has expressed a reluctance to intervene in the indictment process." Hogan, supra, 144 N.J. at 228. "In seeking an indictment, the prosecutor's sole evidential obligation is to present a prima facie case that the accused has committed a crime." Id. at 236. "'[T]he decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion.'" State v. Perry, 124 N.J. 128, 168 (1991) (quoting Bordenkircher v. Haye, 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L. Ed. 2d 604, 611 (1978)). It is not the role of a reviewing

court to question the strength of the case, its possible deterrent value, or the government's enforcement priorities. Ibid. Nonetheless, the reviewing court's responsibility remains to examine whether "an indictment alleges all the essential facts of the crime[.]" State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 19 (1984).

Recently, the Court expounded on the nature of judicial review of a challenge to a grand jury indictment, noting "[t]he grand jury 'is an accusative rather than an adjudicative body,' whose task is to 'assess whether there is adequate basis for bringing a criminal charge.'" State v. Saavedra, 222 N.J. 39, 56 (2015) (quoting Hogan, supra, 144 N.J. at 229-30).

> A trial court deciding a motion to dismiss an indictment determines "whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it." [State v. Morrison, 188 N.J. 2, 13 (2006)] (citing State v. Reyes, 50 N.J. 454, 459 (1967)). A court "should not disturb an indictment if there is some evidence establishing each element of the crime to make out a prima facie case." Id. at 12 (citing Hogan, supra, 144 N.J. at 236; State v. Vasky, 218 N.J. Super. 487, 491 (App. Div. 1987)).
>
> [Id. at 56-57.]

A trial court's decision on a motion to dismiss an indictment involves an exercise of discretion. Id. at 55; State

v. Weleck, 10 N.J. 355, 364 (1952) ("[T]he ultimate question on this appeal is whether the trial court abused its discretion in granting the defendant's motion to dismiss the indictments."). In our review, "'[a] trial court's exercise of this discretionary power will not be disturbed on appeal unless it has been clearly abused.'" Saavedra, supra, 222 N.J. at 55-56 (quoting State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994), certif. denied, 140 N.J. 277 (1995)).

Here, defendant was charged with the crime of speculating or wagering on official action or information, which is established by proving these elements:

> A person commits a crime if, in contemplation of official action by himself or by a governmental unit with which he is or has been associated, or in reliance on information to which he has or has had access in an official capacity and which has not been made public, he:
>
> a. Acquires a pecuniary interest in any property, transaction or enterprise which may be affected by such information or official; or
>
> b. Speculates or wagers on the basis of such information or official action; or
>
> c. Aids another to do any of the foregoing, while in office or after leaving office with a purpose of using such information.
>
> [N.J.S.A. 2C:30-3 (emphasis added).]

The State made clear prosecution was based on defendant's acquisition of the farm. Using the non-public information, the developer was desperate to acquire TDR credits.[7]

Initially, we address the State's challenge to the judge's factual findings. The State challenges, as unfounded, the finding "all the farmer[]s in town including [defendant], knew each other and would have talked regularly as early as 2005 . . . ." We note this finding reiterates the judge's comments during oral argument, suggesting "these were farmers who dealt in credits on a daily basis, had dealt with this development before and knew exactly what that meant. We aren't talking about a group of people that had no interaction with this before." Even though comments relating to an assumed familiarity amongst farmers regarding possible shortcomings of the developer's pursuit of TDR credits were uttered, we conclude

---

[7]    N.J.S.A. 2C:30-3 is written in the disjunctive and sets forth alternative elements of the crime. The first alternative includes acquiring pecuniary interest in any property, transaction or enterprise in contemplation of official action by a governmental unit with which he or she is associated, which may be affected by such official action. The second sets forth the use of non-public information gained in an official capacity. Although the entire statute is included in the indictment, the State's argument focused solely on this latter provision. Therefore, we limit our review to this argument. See In re Bloomingdale Convalescent Ctr., 233 N.J. Super. 46, 48 n.1 (App. Div. 1989) (noting that an issue not briefed is waived).

the judge's determination properly focused on the confidential nature of the information.[8]

The narrow question for consideration is whether the State presented evidence to establish defendant obtained and acted upon "information to which he has or has had access in an official capacity and which has not been made public," as proscribed by N.J.S.A. 2C:30-3. We are cognizant of the State's argument the trial judge mistakenly characterized its theory of the case by focusing on the developer's public solicitation for TDR credits, not the aggregation of individual responses to the solicitation, a matter the State maintains was not public knowledge. We consider whether the response rate to the developer's public mass mailer and the developer's "mindset" to this response was the type of non-public information, the use of which was criminal pursuant to N.J.S.A. 2C:30-3.[9]

---

[8] The grand jury record contained no direct evidence, but only the COO's statements that the developer assumed the farmers were close knit. Accordingly, drawing inferential conclusions from this limited evidence cannot support dismissal of the charge. See Hogan, supra, 144 N.J. at 235 ("Credibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury."). Nevertheless, we conclude the cited comments did not undergird the conclusion to dismiss the indictment.

[9] Defendant argues any interested individual could freely obtain a list of TDR credit-owners by request, which was maintained in various township and county records. We need not examine whether this fact, if true, impacts the motion request.

Although no New Jersey court has squarely addressed the meaning of "information . . . which has not been made public," N.J.S.A. 2C:30-3, the language used is not unique.[10] In fact, identical or nearly identical language can be found in corresponding public official misconduct statutes in a host of other states.[11] We mention the review by two states with similar

---

[10] N.J.S.A. 2C:30-3 mirrors Model Penal Code § 243.2. "'When a provision of the Code is modeled after the [Model Penal Code], it is appropriate to consider the [Model Penal Code] and any commentary to interpret the intent of the statutory language.'" Saavedra, supra, 222 N.J. at 75 n.7 (quoting State v. Robinson, 217 N.J. 594, 606 (2014)). We note the commentary associated with this section states:

> Section 243.2 deals with a completely different kind of defalcation by public employees. Specifically, it covers situations where personal gain is sought by the acquisition of property or by financial speculation in cases where the employee has access to inside information by virtue of his employment. It applies both to official action to be taken by the public employee or some governmental unit with which he is associated and to information to which he has access in his official capacity and that has not been made public. It also applies if the official aids any other person to engage in the same type of activity on the basis of inside information.

[11] See Ala. Code § 13A-10-82 (2015) (Alabama); Ark. Code Ann. § 5-52-106 (2015) (Arkansas); Colo. Rev. Stat. § 18-8-402 (2015) (Colorado); Del. Code Ann. tit. 11, § 1212 (2015) (Delaware); Fla. Stat. § 839.26 (2015) (Florida); Ind. Code § 35-44.1-1-1 (2015) (Indiana); Ky. Rev. Stat. Ann. § 522.040 (LexisNexis 2015) (Kentucky); Mo. Rev. Stat. § 576.050 (2015) (Missouri); Neb. Rev. Stat. § 28-925 (2015) (Nebraska); N.C. Gen. Stat. §
(continued)

16                                          A-4008-14T1

criminal statutes that have elucidated the nature of non-public information as used in this context.

Pennsylvania's statute criminalizing the action of speculating or wagering on official action or information is nearly identical to our own. See 18 Pa. Cons. Stat. § 5302 (2015).[12] That law has been interpreted to require the identified information be "confidential information which was obtained by virtue of the actor's official position." Commonwealth v. Wojdak, 466 A.2d 991, 997 (Pa. 1983). Where

_____

(continued)
14-234.1 (2015) (North Carolina); Or. Rev. Stat. § 162.425 (2015) (Oregon); Tenn. Code Ann. § 39-16-404 (2015) (Tennessee); Utah Code Ann. § 76-8-202 (LexisNexis 2015) (Utah).

[12] 18 Pa. Cons. Stat. § 5302, entitled "Speculating or wagering on official action or information[,]" states:

> A public servant commits a misdemeanor of the second degree if, in contemplation of official action by himself or by a governmental unit with which he is associated, or in reliance on information to which he has access in his official capacity and which has not been made public, he:
>
> (1) acquires a pecuniary interest in any property, transaction or enterprise which may be affected by such information or official action;
>
> (2) speculates or wagers on the basis of such information or official action; or
>
> (3) aids another to do any of the foregoing.

A-4008-14T1

information is accessible from other potential sources, it cannot satisfy the non-public element of the statute.  Ibid.

Also, the Texas Legislature, in formulating a similar statute, chose to expressly define "information that has not been made public" to include "any information to which the public does not generally have access, and that is prohibited from disclosure under [the Texas Public Information Act]."  Tex. Penal Code Ann. § 39.06(d) (2015).[13]  Texas courts interpreted

---

[13]  The Texas statute entitled "Misuse of Official Information" provides:

> (a)  A public servant commits an offense if, in reliance on information to which the public servant has access by virtue of the person's office or employment and that has not been made public, the person:
>
> > (1)  acquires or aids another to acquire a pecuniary interest in any property, transaction, or enterprise that may be affected by the information;
> >
> > (2)  speculates or aids another to speculate on the basis of the information; or
> >
> > . . . .
>
> (d)  In this section, "information that has not been made public" means any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code.
> . . . .

this definition as having "two components[,] stated in the conjunctive: information to which the public does not generally have access; <u>and</u> that is prohibited from disclosure under the Open Records Act." <u>State v. Ford</u>, 179 <u>S.W.</u>3d 117, 122 (Tex. Crim. App. 2005). Notably, defining the phrase by direct reference to the state's public information law removes possible vagaries when distinguishing what information a public official may learn in day-to-day activities that would, if acted upon, subject him or her to prosecution under the statute.

When this court engages in statutory interpretation, "[o]ur task . . . is to discern and give effect to the" Legislature's intent. <u>State v. O'Driscoll</u>, 215 <u>N.J.</u> 461, 474 (2013). "To begin, we look at the plain language of the statute." <u>State v. Munafo</u>, 222 <u>N.J.</u> 480, 488 (2015) (citing <u>State v. Frye</u>, 217 <u>N.J.</u> 566, 575 (2014)). In so doing, we are directed to

> look to the plain language of the statute, "which is typically the best indicator of intent." <u>In re Plan for the Abolition of the Council on Affordable Hous.</u>, 214 <u>N.J.</u> 444, 467 (2013). Statutory language is to be interpreted "in a common sense manner to accomplish the legislative purpose." <u>N.E.R.I. Corp. v. N.J. Highway Auth.</u>, 147 <u>N.J.</u> 223, 236 (1996). When that language "'clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms.'" <u>McCann v. Clerk of Jersey City</u>, 167 <u>N.J.</u> 311, 320 (2001) (quoting <u>SASCO 1997 NJ, LLC v. Zudkewich</u>, 166 <u>N.J.</u> 579, 586 (2001)).

. . . .

> [Where a] statute is penal[,] it must . . . be strictly construed. <u>State v. D.A.</u>, 191 <u>N.J.</u> 158, 164 (2007). "The strict construction doctrine, and its corollary, the doctrine of lenity, mean[] that words are given their ordinary meaning and that any reasonable doubt . . . is decided in favor of [the defendant]." <u>Ibid.</u> (quotation omitted).
>
> [<u>State v. Olivero</u>, 221 <u>N.J.</u> 632, 638–39 (2015) (fifth and sixth alterations in original).]

Applying these principles to the matter under review, we conclude the language of <u>N.J.S.A.</u> 2C:30-3 is not ambiguous and, when read in a "common sense manner[,]" <u>Olivero</u>, <u>supra</u>, 221 <u>N.J.</u> at 639, penalizes a person for conduct taken in reliance on information revealed during and by virtue of his or her position as a public official, which was not otherwise disclosed to the public. If no evidence is shown suggesting the identified information was relayed to the public official in confidence or that the information was not otherwise publicly disclosed, an essential element of the statute is not satisfied. Thus, we conclude the plain meaning of <u>N.J.S.A.</u> 2C:30-3 reflects it was not intended to ensnare an individual for utilizing information not conveyed in confidence because of his or her official position.

We recognize the State's argument to differentiate between information regarding the developer's general need for TDR credits and the lackluster response to its offers to purchase available credits. However, neither the face of the indictment nor a searching review of the grand jury testimony reveals any suggestion the response rate itself was somehow confidential. Perhaps the fact was not widely known and, certainly, defendant was directly informed about the developer's plight in soliciting credits because he was the member of the Township Committee who dealt directly with the developer's COO. Yet, nothing supports a conclusion the "dismal" or "terrible" response rate to the offer to buy credits was conveyed to him in confidence or was in fact confidential and communicated solely to him by virtue of his public position.

The grand jury did not elucidate a basis for its conclusion, set forth in the indictment, stating defendant obtained "information from [the developer] concerning a real estate development project, which information was not yet made available to the public[.]" Rather, the evidence presented to the grand jury and rational inferences drawn from that evidence, even in the light most favorable to the State, merely established the information regarding the disappointing response rate was conveyed to defendant by the developer. This record

21                                                    A-4008-14T1

does not evince the additional element that the information was private, confidential, or non-public. Although the extent to which the information was known is not clear, at the very least, the record shows the real estate broker engaged by the developer knew many credits were still needed.

Where there is no evidence to support a charge, "the indictment is 'palpably defective' and subject to dismissal." Saavedra, supra, 222 N.J. at 56 (quoting Morrison, supra, 188 N.J. at 12). Here, the confidential nature of the aggregate response to the developer's mailer was "clearly lacking" in both the facts alleged in the indictment and the evidence presented to the grand jury. State v. Collette, 257 N.J. Super. 557, 566 (App. Div. 1992), certif. denied, 133 N.J. 430 (1993). The order dismissing the indictment was properly entered.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION