**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1457-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DASHAWN T. CARRILLO,

    Defendant-Appellant.

_____

Submitted December 8, 2025 – Decided March 12, 2026

Before Judges Natali and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 22-12-3643.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Michael Denny, Assistant Deputy Public Defender, of counsel and on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Dashawn Carrillo appeals from his Judgment of Conviction (JOC) entered after he pled guilty to second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5b(1), which was seized from his vehicle pursuant to a search warrant after the police stopped defendant's minivan based on their belief it was involved in a shooting in Camden the day before. Defendant moved to suppress the weapon and argued, as he does before us, that the police did not possess reasonable articulable suspicion to justify the motor vehicle stop.

The court held a suppression hearing where the State primarily relied upon the following evidence to support the stop: (1) a ShotSpotter report indicating a shooting occurred; (2) testimony from Detective Ellisha Peatross of the Camden County Shooting Response Team stating she reviewed a surveillance video showing defendant's car driving in the area of the shooting and, significantly, viewed muzzle flashes from defendant's vehicle on that surveillance video; and (3) Detective Peatross's testimony that a license plate reader had scanned defendant's license plate in the vicinity of the shooting. As we discuss in greater detail later in our opinion, the critical video, however, was never admitted into evidence, nor reviewed by the court, and the State later conceded it did not contain images of any muzzle shots from defendant's vehicle,

or any vehicle, for that matter. Nonetheless, the court relied, in part, on Detective Peatross's testimony to deny defendant's motion to suppress.

Significantly, after the hearing, the State admitted that Peatross had "misspoke[n]" and the critical video did not show the shooting or any muzzle flashes—only defendant's vehicle driving on Tenth and Budd, an intersection approximately a block and a half away from the location of the shooting. The proofs from the suppression hearing also did not establish: (1) the timing of when defendant's vehicle was present relative to the timing of the shooting, or (2) the location of the license plate reader that scanned defendant's plate in relation to the location of the shooting.

Given the State's concession that the video did not depict what it previously presented at the suppression hearing, defendant moved for reconsideration. Defendant, however, pled guilty to the single weapons count in the multi-count indictment and withdrew the application before the court could resolve it. Defendant appealed after he was sentenced and, on the State's motion, we remanded for the court to decide the motion for reconsideration.

On remand, following a brief hearing and without issuing any factual findings or legal conclusions—either orally or in a written opinion—the trial court issued an order summarily denying defendant's application. The matter

3

returns to us, and defendant argues, again, that the court erred in denying his motion to suppress because the police did not have reasonable suspicion to stop his minivan. We agree with defendant's arguments and reverse the court's orders denying his suppression motion and his reconsideration application and remand for further proceedings consistent with our opinion.

I.

On September 24, 2022, at approximately 3:07 a.m., a ShotSpotter system detected numerous shots fired at 1050 Budd Street, near the intersection of Tioga Street in Camden. There were no eyewitnesses, descriptions of potential suspects, reports or 911 calls regarding shots fired, nor evidence of injured victims or damaged property. Detective Peatross testified at the suppression hearing and stated that she was "sure there were officers" investigating the scene after the shooting, but because she "wasn't on the scene," she did not know whether any physical evidence was collected.

Detective Peatross stated she first learned of the shooting from another officer, Detective Reveron,[1] after the start of her shift at 3:00 p.m. on September 24th. Detective Reveron told her an "illegal discharge . . . happened at Tenth and Budd at the intersection involving a Navy[-]blue dark-in-colored minivan

---

[1] The detective's first name does not appear in the record before us.

and . . . was also captured in its entirety on video." Detective Peatross testified that she personally observed a surveillance video showing a dark blue Dodge Caravan "that came off of" the intersection of Tenth and Budd and "fled down Tenth Street" and police were able to use a license plate reader to determine the license plate number. She stated the minivan's "windows were tinted" and "[t]hrough further video, it was observed that there were muzzle flashes that came out of the van," but she could not recall how many.

When asked if the surveillance video put the minivan in the area at the time of the illegal discharge, Detective Peatross responded, "[y]es, sir." She did not know, however, where the license plate reader that captured the minivan was located. She also testified she did not know what time the surveillance video captured defendant's vehicle and that "[i]t could have" occurred before the ShotSpotter activation. When the court questioned Detective Peatross if she knew of "the time period between when the ShotSpotter went off and when the vehicle was seen operating in the vicinity," Detective Peatross responded, "I don't offhand. . . ."

The police determined defendant was the registered owner of the vehicle and disseminated a flier to all Camden County police personnel. Defendant's vehicle was spotted two days later on September 26th, and officers conducted a

5

motor vehicle stop in the area of Chapel Avenue and Route 130 in Cherry Hill. Sergeant Rivera provided backup to the motor vehicle stop and a portion of his body-worn camera footage was played before the court during the suppression hearing.

Detective Peatross requested a search warrant and initially testified that because defendant denied consent to search his vehicle, "a narcotics sniff by a K-9 was conducted where it yielded a positive indication." She later testified, however, that she requested the search warrant application based upon a positive indication "for a bomb dog, I would assume."

When asked if she could "dispute" that the search warrant application stated that the license plate reader recorded defendant's vehicle at 3:07 a.m., Detective Peatross stated that she could not dispute it. Upon receiving the search warrant, the police searched defendant's vehicle and found a gun in a cross-body bag. Peatross testified that further forensic testing of the seized firearm "connected . . . defendant to the illegal discharge" through the bullet casings that had been recovered earlier. She did not, however, elaborate further on the specific manner in which the casings and seized firearm were connected nor was there further testimony or other evidence regarding any casings found at the scene of the shooting. She also testified that police also searched the "GPS

6

location" history for defendant's ankle monitor, which yielded a positive indication that he was "in the area during the time of the ShotSpotter" incident at "Tenth and Budd Street."

During the hearing, defendant's counsel objected to not being provided the video referenced by Detective Peatross during her testimony. Defense counsel conceded that he received the surveillance video "that shows the vehicle go past," but it did not have a time stamp. He argued, however, that a video that showed "muzzle flashes coming from the car" was never produced, and no muzzle flashes were mentioned in Detective Peatross's report or in her search warrant application. The State requested a continuance to produce the video that Detective Peatross referred to, which the court denied.

In denying the motion to suppress, the court found Detective Peatross to be credible. As the court found, "[c]ertainly there was muzzle fire," "[c]ertainly . . . this van . . . ha[d] gunfire going off related to [defendant's] license plate and ownership of the vehicle, certainly in this court's mind causes an analysis as to whether there was reasonable suspicion which led to a stop in Cherry Hill."

The court found the ShotSpotter "did go off between approximately 3 a.m. to 3:10 a.m.," and found the "evidence of the ShotSpotter, the license plate reading coming back to [defendant], and the fact that [the] vehicle, . . . was in

the area where the six muzzles went—the six casings were eventually found though that wasn't presented to [the court] . . . but where the shooting occurred, in the Court's opinion, almost simultaneously." The judge acknowledged defendant's "argument regarding the time period" but dismissed it as "somewhat a minor technical dysfunction" and found it was "crystal clear" that defendant "was in the area in the middle of the night and shots were fired from that vehicle." This evidence was "enough to lead to that flier" and "enough to show reasonable suspicion to stop the vehicle."

The court relied upon State v. Wanczyk, 201 N.J. Super. 258 (App. Div. 1985), and State v. Anderson, 198 N.J. Super. 340 (App. Div. 1985), which, according to the court, "speak to whether the State can detain someone when it's identified as a possible suspect for a previously[]committed crime." The court found "there's [not] the slightest doubt that these officers should have stopped the vehicle" because "there clearly is overwhelmingly reasonable suspicion" that defendant "left the area after [the] ShotSpotter identified it, caught on camera." Further, the court determined the warrant was justified, the officers "did the proper thing of impounding the vehicle," and the dog sniff was not "unreasonable or prolonged the stop to investigate the evidence—for evidence of the shooting."

Defendant was subsequently indicted by a Camden County grand jury with two counts of second-degree unlawful possession of a weapon, and three counts of second-degree certain persons not to possess a weapon, N.J.S.A. 2C:39-7b(1). At the initial disposition conference defendant pled guilty to a single count of second-degree unlawful possession of a weapon.[2] Defendant also raised the fact that he filed a motion for reconsideration and argued the court should reconsider its decision because the ruling was based significantly upon its credibility findings with respect to Detective Peatross, the sole witness. He argued Detective Peatross's testimony describing the surveillance video she reviewed showing shots were fired from defendant's vehicle was "not accurate" because the State later admitted the video "does not exist and never existed" in the form to which she testified.

The court accepted defendant's plea and imposed the negotiated plea agreement and sentenced defendant to a three-year term of imprisonment with one year of parole ineligibility, and dismissed the remaining counts. The court

---

[2] We note an error that seemingly exists in the JOC based on the record before us. Specifically, the JOC states defendant was charged with third-degree absconding from parole in violation of N.J.S.A. 2C:29-5(b), an offense for which defendant was not indicted.

also credited defendant with 444 days of jail credit. Defendant also advised the court that he withdrew his reconsideration application.

After defendant filed his notice of appeal, the State moved for a limited remand, pursuant to Rule 2:9-1, arguing the trial court was precluded from addressing defendant's motion for reconsideration due to defendant's withdrawal of the motion and acceptance of the plea. We granted the State's motion and remanded for the trial court to "consider defendant's motion for reconsideration," and directed a hearing "within 45 days." Pursuant to our order, the court conducted a hearing on January 24, 2025 where the court stated it would "probably . . . just issue something on the record and e-mail you in regards to that." The court issued a written order denying defendant's motion for reconsideration "for reasons set forth on the record," but as noted, the record before us contains neither a written nor an oral explanation providing the court's reasoning.

Before us, defendant argues the court erred in denying his motion to suppress and denying his reconsideration application because the State failed to demonstrate the police had sufficient reasonable suspicion to conduct a motor vehicle stop. Specifically, defendant claims the mere fact that his vehicle was

10

in the vicinity of a shooting, did not, without more, tie him to that alleged shooting.

Further, defendant contends the trial court erred in relying on Detective Peatross's testimony that a video showed muzzle flashes coming from defendant's vehicle, as no such video exists. Although the State concedes that Detective Peatross misspoke, the State argues the trial court's ruling "was not anchored to the muzzle flash," but rather, also focused on other evidence which showed defendant's vehicle in the vicinity during "early morning hours when vehicular traffic would be light if not nonexistent" thereby providing officers with reasonable and articulable suspicion to stop defendant's car. We agree with defendant's arguments and reject the State's.

Our review of the denial of a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We "review with substantial deference to the trial court's factual findings, which we 'must uphold . . . so long as those findings are supported by sufficient credible evidence in the record.'" State v. Hinton, 216 N.J. 211, 228 (2013) (quoting State v. Handy, 206 N.J. 39, 44 (2011)). We "owe no deference" to conclusions of law made by the trial court, which is reviewed de novo. State v. Brown, 456 N.J. Super. 352, 358-59 (App. Div. 2018) (citing State v. Watts, 223 N.J. 503, 516 (2015)).

11

The Fourth Amendment of the United States Constitution, and Article I, Paragraph 7 of the New Jersey State Constitution, provide "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. Although warrantless searches or seizures are "presumptively invalid," State v. Pineiro, 181 N.J. 13, 19 (2004), "[n]ot all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement," State v. Rosario, 229 N.J. 263, 271 (2017) (alteration in original) (citation omitted) (quoting State v. Rodriguez, 172 N.J. 117, 125 (2002)).

One such exception to the warrant requirement is an investigative stop, also known as a Terry[3] stop. Rodriguez, 172 N.J. at 126-27. See Rosario, 229 N.J. at 272 (describing an investigative stop as a police encounter during which an objectively reasonable person would not feel free to leave). An investigative stop, such as an automobile stop, is "permissible 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" State v. Chisum, 236 N.J. 530, 545-46 (2019) (quoting Pineiro, 181 N.J. at 20); see also State v.

---

[3] Terry v. Ohio, 392 U.S. 1 (1968).

Golotta, 178 N.J. 205, 213 (2003) ("Reasonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest.").

"Although reasonable suspicion is a less demanding standard than probable cause, '[n]either 'inarticulate hunches' nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" State v. Goldsmith, 251 N.J. 384, 399 (2022) (quoting State v. Stovall, 170 N.J. 346, 372 (2002)); see also State v. Gibson, 218 N.J. 277, 291-92 (2014) (explaining an officer's hunch, even if later proven correct, does not justify an investigatory stop). The State bears the burden to prove that a warrantless stop was valid. State v. Atwood, 232 N.J. 433, 444 (2018).

Before us, the threshold question turns on whether the court erred in finding the officers had a reasonable, articulable suspicion to stop defendant's vehicle. Determining whether reasonable articulable suspicion exists is a "highly fact-intensive inquiry," which requires a reviewing court to "evaluate 'the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted [or] overbearing police intrusions.'" State v. Nyema, 249 N.J. 509, 527 (2022) (quoting State v. Privott,

13

203 N.J. 16, 25-26 (2010)).  Our case law has recognized that "the proximity of the stop in time and place to the crime in question" can be "critical to the resolution of the existence of a reasonable and articulable suspicion."  State v. Gavazzi, 332 N.J. Super. 348, 357 (App. Div. 2000).

Here, one critical fact remains undisputed:  the State conceded the video purportedly showing muzzle flashes emanating from defendant's vehicle does not, in fact, exist.  Yet, the trial court relied on Detective Peatross's testimony about this non-existent video evidence, finding her "credible," and relying upon her testimony to find "[c]ertainly there was muzzle fire," "[c]ertainly . . . this van . . . ha[d] gunfire going off" and further determined the stop was valid because it was "just overwhelmingly crystal clear" that the vehicle owned by defendant "was in the area where the six muzzles went," that the "shots were fired from that vehicle," which was "enough to lead to that flier" and "enough to show reasonable suspicion to stop the vehicle."  In light of the State's concession, and other evidence elicited at the suppression hearing, we conclude the trial court's findings are not based on competent, credible evidence in the record and thus not entitled to our deference.  See Goldsmith, 251 N.J. at 403.

Simply put, the court's findings are fundamentally flawed because they are based on, at best, incorrect information.  Detective Peatross, who testified

that her knowledge was only based on reviewing an alleged video and not her personal observations, obviously could not have seen any "muzzle flashes that came out of the van," because there is no proof that any such muzzle shots were actually captured on video. Thus, there was no evidence that shots were fired from defendant's vehicle. Although the court found Detective Peatross "credible," her testimony about the video was unsupported by any fact.

The video that does exist, which defense counsel conceded shows defendant's "vehicle go past" but did not have a time stamp, was never admitted into evidence, shown to the court, or provided to us in the appellate record. As a result, our ability to assess what the video actually depicts is limited. Again, the only testimony describing its contents was provided by Detective Peatross who, as noted, provided an inaccurate description of that video.[4]

Setting aside Detective Peatross's incorrect testimony and relying solely on the credible evidence in the record, "what this record does not show is more persuasive than what it does reveal." State v. Richards, 351 N.J. Super. 289,

---

[4] We have previously disapproved of the practice of not admitting referenced video evidence into the formal record. See State v. Boston, 469 N.J. Super. 223, 232 n.1 (App. Div. 2021) (criticizing the practice of not admitting videos in evidence during a suppression motion while still making them available to the court for review "if necessary" reasoning that it "leaves the record open and unsettled, inappropriately so") (citing R. 1:2-3 (stating "[t]he verbatim record of the proceedings shall include references to all exhibits")).

307 (App. Div. 2002) (citing State v. Tucker, 136 N.J. 158, 169 (1994)). The record reflects that on September 24, 2022, at approximately 3:07 a.m., a ShotSpotter system activated and reported a shooting near the intersection of Budd and Tioga. There was no testimony or evidence presented at the suppression hearing that physical evidence was recovered from the scene, despite the court's reference to "casings found."

Rather, after learning of the incident from a colleague, Detective Peatross obtained a surveillance video capturing Tenth and Budd, an intersection approximately a block and a half from where the shooting occurred. The surveillance video showed defendant's vehicle driving on Tenth and Budd, but there was no evidence as to the time that occurred. Indeed, it is unclear as to how the trial court concluded defendant's vehicle "left the area after [the] ShotSpotter identified it" as Detective Peatross testified that she did not know when defendant's vehicle was shown in the video and admitted it could have occurred before the activation.

Similarly, Detective Peatross testified she did not know when the license plate reader logged defendant's vehicle and confirmed that she did not know if it was before the ShotSpotter activation. According to defendant, Detective Peatross's certification in conjunction with the warrant application provided that

16

the license plate reader logged defendant's vehicle at 3:07 a.m. However, Detective Peatross conceded that she did not know where the license plate reader was located. Thus, even if the license plate reader scanned defendant's plate at 3:07 a.m., there is no credible evidence in the record establishing how close defendant's vehicle was at that time to Budd and Tioga, the location of the shooting.

Aside from this information, there was no other competent credible evidence in the record that supported the stop of defendant's vehicle. Because this evidence demonstrates, at best, that defendant's vehicle was in the general area with no specific connection to the shooting, we conclude such limited evidence was insufficient to establish reasonable articulable suspicion to stay this opinion.

The court relied upon Wanczyk, 201 N.J. Super. at 258, and Anderson, 198 N.J. Super. at 340, to find "there's [not] the slightest doubt that these officers should have stopped the vehicle." Neither case is factually similar to the facts here, where proximity to a crime scene, accompanied by additional corroborating evidence, was held to justify an investigative detention.

In Anderson, the police "received a report that three black males armed with handguns had committed an armed robbery" on Anderson Street at

17

approximately 1:30 a.m. 198 N.J. Super. at 347. Responding to the scene, an officer observed a car "occupied by two black males traveling in the opposite direction[,] . . . several blocks away from the robbery scene." Id. at 347-48. Because the windows were tinted, the officer was unable to determine whether a third occupant was in the rear of the vehicle, but noted the car was the only one on the road. Id. at 347. "[B]elieving the car's occupants fit the description of the robbery suspects," the officer pulled the vehicle over, "only minutes" after receiving the armed robbery report. Ibid. The Appellate Division found the investigatory stop was lawful based on the "circumstances presented . . . ." Id. at 351.

In Wanczyk, sometime between 10:15 and 10:30 p.m., officers responded to the Watchung Reservation, where they found a historical landmark engulfed in flames. 201 N.J. Super. at 260. After a firefighter provided a detailed description of an individual who was observed leaving the area at the time of the fire, as well as the direction he was headed, police were told that the individual had gotten into a "brown or tan-colored Chevy with license plate number 591–EIB" and drove away. Id. at 261. Shortly thereafter, police spotted the vehicle and pulled it over. Ibid. The driver of the car was an elderly man, defendant's father, and defendant, who fit the physical description of the suspect,

was in the back seat. Id. at 262. We found the stop "passed constitutional muster" reasoning that an "officer may in appropriate circumstances and in an appropriate manner approach for purposes of investigating possible criminal behavior." Id. at 264 (quoting Terry, 392 U.S. at 22).

In each case, we permitted investigative stops when officers had both a description of the individual suspects and additional corroborating evidence to support a stop of the suspect's vehicle. Here, there was no description of the shooting suspect and the only evidence before the court was that defendant's vehicle was in the general vicinity of the shooting. Given the lack of clarity as to the time defendant's vehicle was captured on video and the lack of any evidence that defendant or his vehicle was, in fact, involved in the shooting, we conclude the police did not have sufficient facts to justify the stop. See State v. Kuhn, 213 N.J. Super. 275, 281 (App. Div. 1986) (finding defendant's presence in a neighborhood frequented by drug users, by itself, is not a ground for concluding that defendant himself was engaged in criminal activity) (citing Brown v. Texas, 443 U.S. 47, 52 (1979)).

Our Supreme Court confronted a similar situation in State v. Nyema, 249 N.J. at 514. In that case, around midnight, the arresting officer, Sergeant Mark Horan, was alerted that an armed robbery "just occurred," with the dispatcher

describing the suspects as "two Black males, one with a handgun." Id. at 514-15. While driving to the robbed 7-Eleven, and approximately three-quarters of a mile from the scene, Sergeant Horan used his spotlight to illuminate the inside of a car approaching in the oncoming traffic lane, but observed the occupants did not match the description, and appeared "annoyed" by the spotlight. Id. at 516-17. After letting them pass, a second car approached, whereby he again illuminated the inside of the vehicle and observed three Black males who did not react to the spotlight, which Sergeant Horan thought was "odd." Id. at 517. Sergeant Horan stopped the second car and subsequently learned it was reported stolen and arrested the three occupants. Id. at 518.

The court found reasonable suspicion existed, reasoning the stop occurred close to the robbery in terms of both time and space; Sergeant Horan observed the vehicle approaching from the direction of the crime scene when there were few vehicles on the road; the vehicle's occupants "gave no response whatsoever" to the lights shone on them; and the racial makeup of the occupants of the vehicle matched the description and were traveling away from the scene. Id. at 519.

The Supreme Court disagreed, finding that a "generic description that encompasses every man belonging to a particular race cannot, without more, meet the constitutional threshold of individualized reasonable suspicion." Id. at

20

532. The Court further determined that a suspect's conduct may be a factor to consider, "but when the conduct in question is an ambiguous indicator of involvement in criminal activity and subject to many different interpretations, that conduct cannot alone form the basis for reasonable suspicion." Id. at 534. In consideration of the closeness of Sergeant Horan's encounter with defendants in terms of spatial and temporal proximity to the robbery, the Court found it "did not add significantly to the analysis of whether the stop was lawful." Ibid. Despite Sergeant Horan's testimony providing the robbery "just happened" when he encountered defendants' vehicle three minutes after receiving the dispatch, the Court determined the record was unclear as to the relation of events and reasoned "a matter of minutes makes a difference given the area in which the suspects could reasonably be expected to be after the commission of the robbery." Ibid.

Here, in light of the parties' conflicting arguments regarding timing, along with inconsistencies in Detective Peatross's testimony and credibility concerns arising from her testimony that she saw incriminating events on the video the State later conceded did not exist, the record does not establish the timeline of events. See, e.g., Tucker, 136 N.J. at 173 (finding the court "must decide the case on the record that is before [it]").

21

Despite the fact that defendant's vehicle was shown driving on Tenth and Budd, no evidence was offered to establish when this occurred in relation to when the shooting happened. Similarly, notwithstanding the fact that defendant's license plate was scanned, no evidence was offered to establish where the license plate reader was located in relation to where the shooting occurred. These facts, when taken together, are not enough to rise to the level of reasonable suspicion. See Nyema, 249 N.J. at 533 ("[A] suspect's conduct can be a factor, but when the conduct in question is an ambiguous indicator of involvement in criminal activity and subject to many different interpretations, that conduct cannot alone form the basis for reasonable suspicion.").

Additionally, we note that before us the State does not rely on other facts to justify defendant was lawfully stopped, as it seemingly did at the suppression hearing, such as the fact that the ankle monitor defendant was wearing at the time of his arrest confirmed he was indeed in the general area at the time of the shooting, and the fact that defendant had an outstanding warrant. Thus, we consider those arguments waived. State v. L.D., 444 N.J. Super. 45, 56 n.7 (App. Div. 2016) ("[A]n issue not briefed is waived."); N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501, 506 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."). In any event, these facts cannot

be considered as they were not known to police prior to the stop. See Nyema, 249 N.J. at 532 ("Information acquired after a stop cannot retroactively serve as the basis for the stop.").

Further, because the State did not have reasonable articulable suspicion for the motion vehicle stop, we also conclude the evidence found must be suppressed. See State v. Herrerra, 211 N.J. 308, 330 (2012) (explaining exclusionary rule barring introduction into evidence the "fruits" of illegal search or seizure); State v. Scriven, 226 N.J. 20, 33-34, 38, 40 (2016) (finding handgun properly suppressed where motor-vehicle stop was not justified); see also Atwood, 232 N.J. at 438, 448-49 (holding drugs found pursuant to a search warrant must be suppressed when the officer did not have reasonable suspicion to justify the underlying motor vehicle stop). Accordingly, we conclude the court erred when it denied defendant's motion to suppress and misapplied its discretion when it denied defendant's reconsideration application.

Finally, we note that the court on remand failed to comply with Rule 1:7-4 when it summarily denied defendant's reconsideration motion. We decline the opportunity to order a further remand to correct this procedural error because: 1) neither party has requested such relief; 2) the record is sufficiently clear for us to decide the matter; and 3) a remand would unnecessarily delay resolution

23

of this appeal.  See Price v. Himeji, LLC, 214 N.J. 263, 295 (2013) (affirming Appellate Division's decision to resolve the matter through review of the provided record rather than through remand).

Reversed and remanded for proceedings consistent with this opinion.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-1457-23