**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0941-22

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

HAMILTON MORGAN, a/k/a
KHASIM PARKS,

    Defendant-Respondent.

_____

Argued January 15, 2025 – Decided April 8, 2025

Before Judges Currier, Marczyk, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 19-07-0387.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the briefs).

Peter Rhinelander, Assistant Prosecutor, argued the cause for respondent (Janetta D. Marbrey, Mercer County Prosecutor, attorney; Peter Rhinelander, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant appeals from his convictions of murder and other related offenses following a jury trial, asserting error in multiple evidentiary rulings. Defendant also contends the trial court's order amending his sentence eighteen months after imposition of the original sentence is illegal under Rule 3:21-10(a) and unconstitutional. After a careful review, we affirm the convictions.

However, the amended Judgment of Conviction (JOC) was inconsistent with the sentence imposed at the sentencing hearing, was issued after the timeframe established in Rule 3:21-10(a), and significantly changed the period of parole ineligibility. For these reasons, we vacate the amended JOC and remand for a new sentencing hearing.

I.

At 6:00 p.m. on May 7, 2019, Maurice Rowe was standing on the sidewalk of Hoffman Avenue in Trenton, near a deli located on the corner of Stuyvesant and Hoffman Avenues. Rowe and several other men were playing dice.

Surveillance cameras captured the shooting and the sequence of events before and following it, and the video footage was shown to the jury at trial. The video depicted a black male walking down Wilnot Alley prior to the

2

shooting, crossing Hoffman Avenue, and approaching the group of men playing dice. The man was wearing a black zippered hooded sweatshirt with white hood drawstrings, with the hood up, dark colored sweatpants, and dark colored sneakers.

As the man approached the sidewalk, he held up a handgun and started shooting. Rowe and the other men tried to run away, but the shooter chased Rowe toward the front of the deli and shot him several times in the head, killing him. He then turned around and ran back down Hoffman Avenue, crossed the street, and ran into Wilnot Alley at 6:03:45 p.m.

At the same time, Trenton Police Detectives Stephen Szbanz and John Carrigg were driving on Hoffman Avenue in their unmarked police car. Carrigg was driving and Szbanz was in the passenger seat. The officers had their windows down and it was still light out. As they were driving, both detectives heard gunfire, approximately eight or nine shots. They saw a man dressed all in black running across Hoffman Avenue into Wilnot Alley. Szbanz described the person as a black male with a "black hoodie on, black sweatpants, and the hood was up," which struck him as odd because the weather was warm.

As they drove down Wilnot Alley, Szbanz saw the man had a black handgun in his right hand. The video shows the detectives' vehicle turned onto

3

Wilnot Alley at 6:03:54 p.m. The detectives saw the man run down Wilnot Alley and turn left onto Ellsworth Avenue, cross Ellsworth and run alongside 22 Ellsworth Avenue. Carrigg turned the vehicle left onto Ellsworth, and Szbanz got out of the car and gave chase on foot.

Szbanz identified himself as a police officer and told the man to stop but he kept running. The man ran to the rear yard of 22 Ellsworth and jumped over the fence between 22 and 20 Ellsworth into the backyard of 20 Ellsworth. Szbanz had his weapon drawn and ordered the man to stop, but the man opened the gate at 20 Ellsworth and ran back out toward the front yard. Szbanz tried to transmit the man's location on his radio, but he could not get a signal.

Szbanz did not jump over the fence because he did not want to holster his weapon, as he did not know if the man he was chasing still had his weapon. Instead, Szbanz went back out of the yard to Ellsworth Avenue, and saw the man exit the yard of 20 Ellsworth, and run down Ellsworth Avenue towards Stuyvesant Avenue. Szbanz ran up behind the man and tackled him to the ground in front of 18 Ellsworth Avenue, placing him under arrest.

In the meantime, Carrigg, who saw the man run into the rear yard of 22 Ellsworth, drove the police vehicle in reverse back to Stuyvesant Avenue while calling Szbanz on the radio to find out his location. Carrigg got out of the car

A-0941-22

and heard Szbanz say "he's coming right back out where he went in."  When Carrigg heard that, he ran around the corner "back up Ellsworth" and saw the man on the ground with Szbanz on top of him.

At trial, both Szbanz and Carrigg identified defendant as the man Szbanz chased, tackled, and ultimately arrested.  According to Szbanz, from the time he saw defendant running on Wilnot Alley until his arrest, he lost sight of him only two times:  once for a "split second" as defendant ran on the walkway between 22 and 24 Ellsworth Avenue, and a second time when defendant hopped the fence between 20 and 22 Ellsworth Avenue.  Szbanz testified that during the entirety of the chase, no one else came into view.  Carrigg testified that when he arrested defendant he was wearing the same outfit as when Carrigg observed him running.

Sergeant Luis Nazario was working as a crime scene detective at the time of the shooting.  He testified that when defendant was arrested, he was wearing a "black hooded" "polo zip-up sweater" with "white drawstrings" and black or navy blue Nike sweatpants with holes below the right rear pocket.  The sweater and sweatpants both had pockets without zippers.  At the time of his arrest, defendant was wearing only one sneaker, as his other sneaker came off when Szbanz tackled him.  As lead investigator Detective Patrick Holt testified,

5

defendant's clothing at the time of his arrest was "extremely similar to the clothes that we observed on the surveillance footage."

Detective Jason Astbury searched defendant incident to his arrest and found a black Glock nine-millimeter ammunition magazine containing fourteen live rounds. Police also found a Glock nine-millimeter handgun on the grass in front of 18 Ellsworth. According to Carrigg, the gun was found "[a]pproximately ten feet away" from where Szbanz tackled defendant. Nazario testified the slide of the handgun was "locked to the rear," which indicated that the weapon had been fired and contained no more rounds. He also stated the detectives found a single size eight black and blue Nike Air Jordan sneaker, for a left foot, on the sidewalk by 18 Ellsworth Avenue.

After his arrest, defendant was transported to the Trenton Police Department headquarters and then transferred to the headquarters of the Mercer County Homicide Task Force in Trenton. Detective Roberto Reyes of the Homicide Task Force observed defendant leaving the Trenton Police Department headquarters wearing only one sneaker. As both Reyes and defendant were entering the Homicide Task Force headquarters, Reyes observed that defendant was no longer wearing the sneaker.

A-0941-22

Reyes and another officer looked inside the police vehicle that had transported defendant and found a sneaker underneath the rear passenger seat. It was a black and blue Nike Air Jordan, size eight, for a right foot.

Reyes brought the sneaker into the Homicide Task Force interview room with defendant. He dropped the sneaker on the floor of the interview room to use both hands to uncuff defendant and then cuff him to the bench. Reyes left the interview room and later returned with Detective Scott Peterson. Proceedings in the interview room were audio and video-recorded, and a seven-second portion of the video was played for the jury. As shown in the video, Peterson asked, "who[se] sneaker?" and Reyes responded, "[t]hat's his" at the same time defendant said, "[m]ine." Defendant then said, "[t]hey took the other one. The other one at the station."

The police gathered surveillance video from several locations in the area of the shooting, including from the deli and a liquor store located on Stuyvesant Avenue. However, officers did not attempt to retrieve any footage from any cameras on Wilnot Alley, Ellsworth Avenue, or the next parallel street, Edgemere Avenue. Defendant's last known address was on Edgemere Avenue.

Police also obtained footage from certain cameras maintained by the City of Trenton, known as "pole cameras" which are set on poles "mainly in the high

crime areas" of Trenton. Detective Edward Cunningham of the Trenton Police Department Technical Services Unit testified that in 2019, there were sixty to eighty pole cameras operating in Trenton. Some pole camera locations have only one camera, some have three cameras—two fixed cameras and one "PTZ camera"—which stands for "pan-tilt[-]zoom." The pole cameras were not live monitored in 2019, but police officers could review the camera footage by logging into the computer system using a phone app. According to Cunningham, the camera footage was retained for approximately two weeks until the "system starts writing itself over."

In May 2019, there were pole cameras located on Stuyvesant and Hoffman, Rosemont and Hoffman, and Oakland and Hoffman. According to Cunningham, the Stuyvesant and Hoffman location had three cameras, but only the PTZ camera was working in 2019. The Rosemont and Hoffman location had three cameras that were all working. Although the Oakland and Hoffman location had three cameras, Cunningham was not aware whether they were functional at the time of the shooting.

The jury watched video footage from the cameras at Stuyvesant and Hoffman, and Rosemont and Hoffman. There were instances of "buffering" in the video footage, where the footage "skips," which resulted from delays in how

the footage was "being pushed over the internet" to the network servers at the Trenton Police Department. Cunningham also testified there were pole cameras near 33 and 35 Ellsworth Avenue, but he was not sure if they were present in 2019. However, he further stated that, if the cameras existed in 2019, they were not operational, nor were they operational at the time of trial.

Police attempted to talk to witnesses of the shooting but were not "able to come up with any information" other than the video footage. However, police did not knock on any doors or try to speak with any residents of Ellsworth Avenue or Edgemere Avenue "to see if they observed anything." Defendant's clothing was not tested for gunshot residue or DNA.

Assistant Medical Examiner Allison Mautone, who performed an autopsy on Rowe, testified that he was shot numerous times. Rowe had five gunshot wounds to the head, two to the neck, three to the buttocks, one to his left arm and one to his right wrist. Mautone testified that Rowe's cause of death was multiple gunshot wounds, and that the five gunshot wounds to the head would have been immediately fatal.

Police collected numerous spent shell casings and projectile fragments from the scene of the shooting. Multiple projectile fragments were also collected from Rowe's body during the autopsy. At trial, the State presented

9

expert ballistics testimony from Stephen Deady, formerly with the New Jersey State Police, a certified member of the Association of Firearm and Toolmark Examiners (AFTE) with decades of experience in the ballistics field. Deady had compared over 10,000 specimens in the course of his career and been qualified as a firearms expert approximately 180 times.

Deady explained the methodology of "comparison microscopy" which can determine whether a bullet or a cartridge case was fired from a "particular firearm."

> So, we'll take and we'll fire what we call test bullets out of that gun and we'll first place those test bullets to familiarize our minds eye with the particular patterns of striated marks which appear[] on those bullets and then we will . . . compare them to that questioned bullet and if we're able to see those same patterns, the striated mark[s], then we can, yes, this bullet was fired from this particular gun.
>
> We do the same thing with cartridges cases or discharged shells . . . where we would then do the same procedure.

Deady testified that he reviewed eighteen projectile fragments collected at the scene of the shooting and during the autopsy and was able to identify nine of them as having been fired from the gun that was recovered from the grass in front of 18 Ellsworth Avenue. Deady further said that he examined twelve shell

10

casings found at the scene and determined that they were discharged by the same gun.

Testing did not reveal any fingerprints on the ammunition magazine or the live rounds that were found on defendant's person following his arrest. There were no DNA results obtained from the gun.

Defendant presented the testimony of investigator Anarish Rivera, who testified that she took photos on Ellsworth Avenue on July 14, 2021. Photos of the vacant lot at 37 Edgemere Avenue were entered into evidence.

II.

A grand jury returned an indictment charging defendant with first-degree purposeful or knowing murder of Maurice Rowe, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count three); and second-degree possession of a handgun by certain persons not to possess a firearm, N.J.S.A. 2C:39-7(b) (count four).

Defendant moved to suppress his post-arrest statement to police. After two days of hearings, the court granted the motion in part, permitting two questions and answers and striking the remainder as discussed further below.

11

Following the trial in 2021, the jury convicted defendant on counts one through three of the indictment. Defendant was then tried on count four and found guilty.

Defendant was sentenced on February 17, 2022. The court merged defendant's conviction on count two into his conviction on count one. On count one, the court sentenced defendant under the "three strikes law[,]" N.J.S.A. 2C:43-7.1, to life imprisonment without the possibility of parole. On counts three and four, the court imposed concurrent ten-year terms with five-year periods of parole ineligibility.

## III.

Defendant filed a notice of appeal in November 2022. On July 7, 2023, the court issued an amended JOC altering defendant's sentence on count one. As amended, the court sentenced defendant on count one to a life sentence under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, with a five-year period of parole supervision.

## IV.

On appeal, defendant raises the following points in his counseled brief:

> POINT I
> THE TRIAL JUDGE UNDULY RESTRICTED DEFENDANT'S DUE-PROCESS AND SIXTH-AMENDMENT-BASED RIGHT TO PRESENT A

COMPLETE DEFENSE WHEN SHE: (1) EXCLUDED DEFENSE PHOTOS OF MUNICIPAL SURVEILLANCE CAMERAS ON ELLSWORTH AVENUE THAT POLICE SHOULD HAVE CHECKED IN THEIR INVESTIGATION, BECAUSE THE JUDGE INCORRECTLY BELIEVED THE PHOTOS WERE NOT PROPERLY AUTHENTICATED AND LACKED RELEVANCE, AND (2) PREVENTED DEFENSE COUNSEL FROM INTRODUCING PHOTOS OF ADJACENT PROPERTIES ON EDGEMERE AVENUE AND FROM ARGUING THAT THE ACTUAL PERPETRATOR COULD HAVE RUN THROUGH THOSE PROPERTIES ON THE WAY FROM ELLSWORTH TO EDGEMERE WHEN POLICE BRIEFLY LOST SIGHT OF HIM.

POINT II
THE JUDGE COMMITTED REVERSIBLE ERROR BY REFUSING TO SUPPRESS STATEMENTS BY DEFENDANT THAT WERE MADE IN RESPONSE TO POLICE QUESTIONING THAT OCCURRED AFTER DEFENDANT HAD INVOKED HIS RIGHT TO SILENCE.

POINT III
THE JUDGE ABUSED HER DISCRETION UNDER N.J.R.E. 609(B) WHEN SHE RULED THAT SIX PRIOR CONVICTIONS OF DEFENDANT'S—THAT WERE ALL MORE THAN 18 YEARS OLD AND FOR WHICH THE SENTENCES HAD ALL BEEN SERVED FOR MORE THAN TEN YEARS—WOULD BE ADMISSIBLE TO AFFECT DEFENDANT'S CREDIBILITY IF HE TESTIFIED.

POINT IV
THE TRIAL JUDGE'S IMPOSITION OF A NEW SENTENCE FOR MURDER MORE THAN 75 DAYS

13

AFTER THE ORIGINAL SENTENCE VIOLATED <u>R.</u> 3:21-10(A) AND THE FACT THAT THE NEW SENTENCE INCREASED THE PERIOD OF TIME BEFORE DEFENDANT WOULD BE ELIGIBLE FOR CONSIDERATION FOR PAROLE, AFTER HE HAD ALREADY BEGUN SERVING THE SENTENCE, ALSO VIOLATED DEFENDANT'S DOUBLE-JEOPARDY RIGHTS.

In a pro se supplemental brief, defendant asserts:

<u>POINT I</u>
THE COURT ERRED FOR LIMITING THE CROSS EXAMINATION OF DETECTIVE SZBANZ WHEN HE DID NOT ALLOW THE DEFENDANT TO PRESENT THE 9-1-1 CAD REPORT DURING HIS TESTIMONY; THE COURT ERRONEOUSLY RULED THAT THE CAD REPORT WAS HEARSAY; THUS VIOLATING DEFENDANT'S RIGHTS TO CONFRONTATION AND TO PRESENT A COMPLETE DEFENSE. THEREFORE A NEW TRIAL IS WARRANTED. <u>U.S. CONST.</u> <u>AMENDS</u> V XIV, <u>N.J.</u> <u>CONST.</u> ART. I PAR. 10.

<u>POINT II</u>
THE COURT ABUSED ITS DISCRETION FOR NOT ALLOWING THE DEFENSE TO PRESENT EVIDENCE OF UNTRUTHFULNESS ON THE PART OF ARRESTING OFFICER CAPTAIN ASTBURY. FAILURE TO DO SO INFRINGED ON DEFENDANTS RIGHT TO CONFRONT HIS ACCUSER AND COMPLETE DEFENSE. THUS VIOLATING DEFENDANT'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY. A NEW TRIAL IS WARRANTED. <u>U.S.</u> <u>CONST.</u> <u>AMENDS</u> VI, XIV <u>N.J.</u> <u>CONST.</u> ART. I PAR. 10.

POINT III
THE JUDGE ABUSED HIS DISCRETION WHEN HE RECONSIDERED HIS OWN RULING THAT PROHIBITED THE STATES EXPERT STEPHEN DEADY TO TESTIFY THAT THE BULLETS IN MAGAZINE (CLIP) FOUND ON DEFENDANT WAS FIRED FROM THE SAME WEAPON RECOVERED FROM THE SCENE; AND THE STATE FAILED TO ESTABLISH THAT THE PREVIOUS RULING WAS PALPABLY DEFICIENT. THUS A NEW TRIAL IS WARRANTED. U.S. CONST. AMEND VI, XIV N.J. CONST. ART. I PAR. 10.

V.

A.

We begin with defendant's assertions in his counseled brief. In Point I, he contends that he was deprived of a fair trial and his right to assert a defense by the trial court's evidentiary rulings excluding from admission at trial certain photographs taken on Ellsworth and Edgemere Avenues in July 2021.

Defense counsel sought to introduce D-111, a photograph Rivera had taken of 31 Ellsworth Avenue on July 14, 2021, in which a pole camera can be seen. The State objected, arguing that the photograph could not be properly authenticated because Rivera could not state that the photograph showed what the area looked like on the date of the crime in May 2019. The court sustained the objection "based on relevance because we need to focus on the date of May 7[], 2019."

Defense counsel argued that the objection would go to the weight of the evidence rather than relevance because during Cunningham's testimony, he was unsure whether the pole camera existed in 2019 but stated that "even if it was there, he knows it was not operational and it's not operational now." The court allowed defense counsel to make a proffer as to the photographs she wished to admit through Rivera's testimony.

Defense counsel clarified that, in addition to D-111, she wished to admit four other photographs taken in July 2021: D-112, a "photograph of the camera on the pole in front of 33 Ellsworth Avenue and 35 Ellsworth Avenue"; D-113,[1] a photograph "from the backyard of 27 Edgemere looking towards 18 and 20 Ellsworth"; D-115, a "photograph of the walkway between 27 Edgemere Avenue and 29 Edgemere Avenue," which bordered at the back 18 Ellsworth Avenue and 20 Ellsworth Avenue; D-116, a photograph of the walkway from 27 Edgemere Avenue and 29 Edgemere Avenue taken from the street; D-117, a photograph of the walkway of 27 Edgemere Avenue and the empty lot at 37 Edgemere Avenue taken from the sidewalk; and D-118, a photograph of the

---

[1] Defendant did not provide a copy of D-113 in his appendix and did not address the photograph specifically in his brief on appeal. Therefore, any issues relating to the trial court's exclusion of D-113 have been waived. See State v. L.D., 444 N.J. Super. 45, 46 n.7 (App. Div. 2016) ("[A]n issue not briefed is waived.").

A-0941-22

empty lot at 37 Edgemere Avenue. Defense counsel stated that she wanted to admit these photographs to assert during her closing argument that they showed a "path of flight or possible location" of the true shooter, who was not defendant.

The court ruled that D-112 was inadmissible for the same reason as D-111—lack of relevance. With respect to D-113, D-115, and D-116, the court found it problematic that defense counsel had presented no evidence of any other person running in the area at the time of the shooting. The court stated: "I don't think you can show a map and say, hey, they could have run this way, they could have run that way, they could have gone here, they could have gone there, if there's no evidence." However, the court reserved decision until the next day, giving defendant the opportunity to call other witnesses to support his proffer.

The next day, defense counsel stated her investigator had found a witness, Shanita Williams, a resident of 34 Ellsworth Avenue for the previous six years, who would testify that the pole camera shown in D-111 and D-112 had been in existence since February 2018. When asked whether Williams would testify that the camera was operable in May 2019, counsel stated that Williams would testify that in December 2020, Trenton police officers came to her home and spoke to "a person by the name Bam" and alleged that "illegal activities occurred at her home and they told Bam that the surveillance cameras on the above

mentioned telephone pole were working." The court asked whether Williams herself had heard what the police officers said or if "Bam told her" what they said, and defense counsel replied that she did not know.

The court and defense counsel agreed that an N.J.R.E. 104 hearing was necessary, and defense counsel stated that Williams was available that afternoon. Thereafter, defense counsel stated that her investigator was driving to Williams's house "right now to pick her up" and bring her to court. In the meantime, the court ruled that the defense could admit only D-117 and D-118, so long as they were authenticated by Rivera, as Holt had earlier testified that there was a vacant lot between 29 and 39 Edgemere in 2019. Shortly thereafter, defense counsel informed the court that Williams was not home.

The court agreed to a break to give defense counsel the opportunity to find Williams. However, defense counsel subsequently stated that she had not been able to contact Williams, and she could not proceed with the Rule 104 hearing. The court denied the request for an adjournment to locate the witness "due to the fact that [the] case was on the trial list for quite some time," and the court only had "a jury until [the] . . . end of the [following] day."

A-0941-22

Defense counsel clarified she was not sure whether Williams was actually present for the conversation Bam supposedly had with police. Thereafter, the defense rested.

During her closing argument, defense counsel did not refer to any of the defense photographs that were admitted but argued to the jury that defendant was just walking in his neighborhood "wearing similar clothing" to the actual shooter. Counsel stated that after Szbanz lost sight of the person he was chasing while he was on the walkway between 22 and 24 Ellsworth Avenue, "[h]e came out of that walkway and he tackled the first person that he saw which was [defendant]."

"We defer to a trial court's evidentiary ruling[s] absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)). Under that deferential standard, we "will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)).

"A preliminary question in any evidence inquiry is whether the evidence is relevant." State v. Wilson, 135 N.J. 4, 13 (1994). N.J.R.E. 401 defines relevant evidence as "evidence having a tendency in reason to prove or disprove

any fact of consequence to the determination of the action." The court found D-111 and D-112, which depicted camera poles, inadmissible as they were not relevant. The court may have misspoken. The photos were relevant to the issue of whether the pole cameras existed at the time of the shooting and investigators could have retrieved footage from them, but the photos were inadmissible because defendant could not properly authenticate them.

As a photograph is considered a "writing" under N.J.R.E. 801(e), it must be authenticated before it may be admitted into evidence. State v. Hockett, 443 N.J. Super. 605, 613 (App. Div. 2016). The proponent of the photographic evidence "is required to make 'a prima facie showing of authenticity.'" Ibid. (quoting State v. Joseph, 426 N.J. Super. 204, 220 (App. Div. 2012)). Although "[t]his burden was not designed to be onerous[,]" ibid., our Supreme Court requires that

> [t]o authenticate a photograph, testimony must establish that: (1) the photograph is an accurate reproduction of what it purports to represent; and (2) the reproduction is of the scene at the time of the incident in question, or, in the alternative, the scene has not changed between the time of the incident in question and the time of the taking of the photograph.
>
> [Wilson, 135 N.J. at 15.]

"The authentication of a photograph requires verification by a qualified individual, one who has made personal observations, thereby establishing that the conditions reproduced existed at the time of the [relevant incident]." Saldana v. Michael Weinig, Inc., 337 N.J. Super. 35, 46-47 (App. Div. 2001). Alternatively, "the witness providing the authentication may testify that the scene, which is depicted, has not changed since the time of the incident in question." Id. at 47.

Defendant did not produce any witness who could provide testimony necessary to authenticate any of the photographs at issue. Rivera's testimony that she took the photographs in July 2021, two years after the shooting, was not sufficient for authentication. Rather, to make a prima facie showing of authenticity, defendant was required to present testimony from a witness with personal knowledge that the photographs depicted the conditions present in May 2019, when the shooting occurred.

Although defense counsel proffered that Williams would so testify, she was unable to produce Williams in court, despite the court delaying trial proceedings for several hours to locate her. The court's denial of defendant's request for a further adjournment was well within its discretion, especially considering that the State had rested its case and the jury was waiting. See State

21

v. Hayes, 205 N.J. 522, 537 (2011) ("New Jersey long has embraced the notion that '[a] motion for an adjournment is addressed to the discretion of the court, and its denial will not lead to reversal unless it appears from the record that the defendant suffered manifest wrong or injury.'" (quoting State v. Doro, 103 N.J.L. 88, 93 (E. & A. 1926))).

Moreover, the jury heard evidence from other witnesses regarding the layout of the backyards in the area and that there were pole cameras on certain streets at the time of the shooting. We are satisfied the court did not err in declining to admit these specific photographs.

B.

Defendant next contends the trial court erred in admitting the statements about his sneaker while in police custody because the statements were made after he invoked his right to silence.

Prior to trial, defendant moved to suppress his statements to police. Peterson, Reyes, and Szbanz testified at the ensuing hearing, and the court watched the video recording of the police interactions with defendant in the interview room. Reyes testified consistent with his later trial testimony that he saw defendant get in the police car to be taken to the Homicide Task Force headquarters wearing one sneaker. When defendant arrived at the Homicide

Task Force headquarters, Reyes saw that he was not wearing the sneaker. Reyes and other officers searched the vehicle in which defendant had been transported and found the sneaker underneath the rear passenger side seat. Reyes took the sneaker upstairs to the interview room where defendant was sitting on a bench. Reyes put the sneaker down next to the bench.

Peterson testified that he was instructed to read defendant his Miranda[2] rights and potentially conduct an interview. Defendant was in an interview room with Reyes at the Homicide Task Force headquarters when Peterson entered the room.

Peterson introduced himself and Reyes to defendant and read him his Miranda rights. Peterson asked if defendant was willing to speak to police, and defendant replied, "Absolutely not." Peterson responded, "[Okay, a]lright." Reyes said, "Alright then, just sit back on the bench for me please."

According to Peterson, he noticed the sneaker on the floor and said, "who[se] sneaker?" Reyes responded, "[t]hat's his" at the same time defendant said "mine." Reyes asked defendant, "This is your sneaker?" and defendant replied, "Yeah." Peterson said, "Alright." Peterson then asked defendant, "You

---

[2] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

A-0941-22

don't want it on . . . you don't want your sneaker on?" Defendant replied, "Nah. Throw it in the garbage." Peterson asked, "You want the sneaker in the garbage?" Defendant replied, "Yeah." Peterson testified that he "wanted to know what to do with" the sneaker, and whether he was "getting rid of it," because if it was defendant's sneaker, he did not "want to be accused of throwing out his articles of clothing or anything of that nature."

According to the hearing transcript,[3] Peterson "moved out of [the] frame," and defendant said, "They took the other one. The other one at the station." Peterson asked, "The other one's at the station?" Defendant replied, "Yeah." Reyes offered defendant a cup of water, which he declined, and the detectives left the room.

In ruling that portions of defendant's statements were admissible, the court rejected defendant's argument that police had brought the sneaker into the interview room as a "decoy" and as "part of some calculated effort to elicit an admission from . . . defendant." The court found that Peterson's[4] initial question about the sneaker was not improper, stating Peterson "was not direct[ing] his

---

[3] The video recording of the interview was not provided on appeal. We rely on the transcript of the interview provided in defendant's appendix.

[4] In its oral ruling, the court misattributed this question to Cunningham.

gaze or his questions to . . . defendant and was instead looking in the direction of the sneaker and at Reyes. In fact, Reyes answered first." Therefore, the court found that defendant's statement "mine" was "admissible as a spontaneous statement."

The court further ruled:

> However, after defendant made that spontaneous statement questions directed at him were posed. While I do not find that these were intended to elicit an incriminating response in an abundance of caution, and per the case law regarding Miranda and its progeny, the police should have limited their questioning at this time to clarifying whether . . . defendant wished to speak to them and I do not believe that they realized that their questions could have elicited an incriminating response at that point but they should have or at least Reyes should have.
>
> Therefore, after the word, mine, stated by . . . defendant spontaneously[,] I find that the following questions and . . . defendant's answers are inadmissible through the question by Peterson, ["]do you want the sneaker in the garbage["] when . . . defendant says ["]yeah["]. But similar to the spontaneous statement made by . . . defendant, that being, mine, the next statement he made after he said, yeah, which was not in response to any question when he said they took the other one, the other one at the station, I find is admissible, again, as a spontaneous statement.

The jury saw the redacted video at trial.

Defendant argues that the admission of defendant's statements regarding the sneaker was erroneous because he invoked his right to remain silent after the Miranda warnings, and the detectives could not "reinitiate interrogation without first giving new Miranda warnings." Defendant asserts the error was not harmless, as the jury knew defendant lied when he said police "took the other" sneaker "at the station," which was evidence of consciousness of guilt.

We review the factual findings by a trial court on a suppression motion "in accordance with a deferential standard. We consider whether those findings are 'supported by sufficient credible evidence in the record.'" State v. Tillery, 238 N.J. 293, 314 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). "[A] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction." Ibid. (quoting State v. A.M., 237 N.J. 384, 395 (2019)) (internal quotation marks omitted). We review de novo any legal conclusions reached by the trial court in admitting a defendant's statements under Miranda. Ibid.

A statement made during a custodial interrogation will be deemed admissible "if it results from the 'voluntar[y], knowing[] and intelligent[]' waiver of [the] constitutional right to remain silent." State v. Knight, 183 N.J. 449, 461 (2005) (quoting Miranda, 384 U.S. at 444). The State bears the burden of

proving beyond a reasonable doubt that a defendant's will was not overborne and their statements were voluntary. State v. Cook, 179 N.J. 533, 562 (2004) (citing State v. Galloway, 133 N.J. 631, 654 (1993)).

In determining whether a defendant has made a valid waiver and provided a voluntary statement, the "court must look at the totality of the circumstances, including the characteristics of the defendant and the circumstances of the interrogation." State v. Timmendequas, 161 N.J. 515, 613-14 (1999) (citing State v. Cooper, 151 N.J. 326, 356 (1997)); see also State v. Sims, 250 N.J. 189, 211 (2022) ("Generally, when a court determines whether an interrogee has knowingly, intelligently, and voluntarily waived his right against self-incrimination in the setting of a custodial interrogation, it considers the totality of the circumstances." (citing State v. Nyhammer, 197 N.J. 383, 402-03 (2009))).

It is well settled that, for the Miranda requirements to apply, the person must be both in custody and subjected to interrogation by law enforcement. State v. P.Z., 152 N.J. 86, 102 (1997) (citing Miranda, 384 U.S. at 444). Miranda defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. "[O]nce a defendant

clearly and unambiguously invokes his right to remain silent, interrogation must cease." State v. Maltese, 222 N.J. 525, 545 (2015). A renewed Miranda warning must be given before police may re-initiate any custodial interrogation. State v. Hartley, 103 N.J. 252, 256 (1986).

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State v. Hubbard, 222 N.J. 249, 267 (2015) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

However, "unexpected incriminating statements made by in-custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible." State v. M.L., 253 N.J. Super. 13, 21 (App. Div. 1991). As this court has observed,

> The intent or purpose of the detective in asking the questions of a defendant may be material in making a determination as to whether the defendant has been subjected to custodial interrogation in violation of his constitutional rights, but is only one of the factors to be considered in analyzing the total situation surrounding the questioning. Such an issue is to be resolved by a consideration of all the circumstances involved.

[State v. Cunningham, 153 N.J. Super. 350, 354 (App. Div. 1977).]

Similarly, renewed Miranda warnings are not required "in situations in which the accused initiates the conversation after previously invoking the right to remain silent" absent "police activity aimed at changing the defendant's mind." State v. Fuller, 118 N.J. 75, 85 (1990). "If an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." State v. Chew, 150 N.J. 30, 61 (1997).

Mindful of those principles, we turn to defendant's contentions regarding the two statements concerning the sneaker. With respect to the first statement, the word "mine" in response to Peterson's question about whose sneaker it was, the court found, after reviewing the videotape, that Peterson's question was not directed to defendant but was rather "in the direction of the sneaker and at Reyes." This factual finding is entitled to deference. Moreover, Peterson testified that the question was not intended to be investigative but was because he wanted to know what to do with the sneaker. Peterson had not brought the sneaker into the room and stated it was "kind of in a corner." Under the totality of the circumstances, we will not disturb the court's discretionary evidential ruling.

Nor do we find error in the ruling regarding defendant's second statement. The transcript of the interview supports the trial court's factual finding that defendant made this statement spontaneously. Peterson's question to defendant immediately preceding this statement was "You want the sneaker in the garbage?" to which defendant replied, "Yeah." The court properly excluded this exchange. But defendant's next statement—that "[t]hey took the other" sneaker "at the station"—was not responsive to Peterson's question and was made after Peterson moved away from defendant. There was no evidence of "police activity aimed at changing the defendant's mind" here. Fuller, 118 N.J. at 85.

We recognize that when a "second confession is so intertwined with the first, it inevitably must be seen as the product of the first and thus wholly tainted by the preceding constitutional violation." State v. Bey, 112 N.J. 45, 74 (1987); see also Hartley, 103 N.J. at 284 (finding "the second statement, coming as it did on the heels of . . . the first, unconstitutionally-obtained, compelled statement, was unavoidably tainted."). However, even if we were to view the trial court's admission of the subsequent statements as error, we find them harmless.

The statements were arguably not inculpatory. There was no reasonable dispute that the sneaker in the interview room did not belong to defendant.

30

Reyes testified he saw defendant with one sneaker on when he got into the police car and that he had no shoes on when he got out of the car. Reyes then told the jury he found the sneaker in the car and brought it to the interview room. So, defendant telling Peterson the sneaker was his was not new information or inculpatory.

Similarly, the record does not support defendant's argument that the second statement could be interpreted as a lie or consciousness of guilt. It was uncontroverted that defendant was the person tackled by police and that he lost his sneaker during the tussle. The issue was whether defendant was the shooter. So, defendant's statement regarding the whereabouts of his second sneaker was not a ground from which the jury could infer consciousness of guilt, as opposed to being mistaken. The court did not abuse its discretion in finding the statements admissible.

C.

We turn to defendant's contention that the trial court erred in ruling that it would admit defendant's nine prior indictable convictions under N.J.R.E. 609 if defendant testified.

Defendant's prior indictable offenses are as follows:

A-0941-22

In May 2002, defendant was convicted of second-degree conspiracy to commit carjacking and was sentenced to a seven-year term of imprisonment.

In September 2002, defendant was convicted of two counts of first-degree robbery and sentenced to two eighteen-year terms in prison with five-year periods of parole supervision under NERA; third-degree possession of a controlled dangerous substance (CDS) with intent to distribute; third-degree unlawful possession of a weapon (air/spring pistol); and third-degree resisting arrest, for which defendant received three five-year terms; fourth-degree possession of CDS with intent to distribute, for which he received an eighteen-month sentence and second-degree possession of a weapon (firearm) for an unlawful purpose, for which he received a ten-year sentence, with a three-year period of parole ineligibility.

In June 2003, defendant was convicted of first-degree robbery, for which he received a seventeen-year sentence, with a five-year period of parole supervision under NERA. Each of defendant's sentences was served concurrently, and defendant was incarcerated on those convictions until he was ultimately released on parole on October 25, 2017, approximately eighteen months before the shooting of Rowe.

A-0941-22

Defendant conceded that his three previous first-degree robbery convictions would be admissible under Rule 609. However, defendant argued that his other six convictions were not admissible because they were too remote, as defendant had completed serving his sentence for those convictions more than ten years prior to the date of the instant offense in May 2019.

The trial court noted the factors set forth in Rule 609(b)(2) that may be considered in determining whether to admit a conviction more than ten years old, holding that two of those factors—how remote the conviction is in time, and the seriousness of the crime—applied. The court considered defendant's conviction for second-degree conspiracy to commit carjacking to "be a serious crime" as was his conviction for second-degree possession of a weapon for an unlawful purpose.

Although the court, citing State v. Sands, 76 N.J. 127, 144 (1978), found that the other third- and fourth-degree offenses were "not maybe the most serious," nevertheless "because of his extensive prior record," defendant showed a "pattern" of "contempt for the bounds of behavior placed on all citizens." The court further noted that defendant was still on parole for his three first-degree robbery convictions when this shooting occurred. Therefore, the court held that,

if defendant chose to testify, all of his prior convictions, appropriately sanitized, would be admissible.

"In New Jersey, a witness generally may be impeached with evidence of a prior conviction." State v. T.J.M., 220 N.J. 220, 233 (2015). Under Rule 609(a)(1), "[f]or the purpose of attacking the credibility of any witness, the witness's conviction of a crime, subject to Rule 403, shall be admitted unless excluded by the court pursuant to paragraph (b) of this rule." The "underlying rationale" of Rule 609 "is the belief that a person who has lived contrary to society's rules and laws by committing crimes should not be able to shield his credibility from the jury and present himself as a law-abiding individual." T.J.M., 220 N.J. at 233.

Rule 609(b) provides that:

> (1) If, on the date the trial begins, more than ten years have passed since the witness' conviction for a crime or release from confinement for it, whichever is later, then evidence of the conviction is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof.

> (2) In determining whether the evidence of a conviction is admissible under subparagraph (b)(1) of this rule, the court may consider:

>> (i) whether there are intervening convictions for crimes or offenses, and if

A-0941-22

so, the number, nature, and seriousness of those crimes or offenses,

(ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,

(iii) how remote the conviction is in time,
(iv) the seriousness of the crime.

A trial court's decision to admit a witness's prior convictions under Rule 609 is reviewed "under an abuse of discretion standard."  T.J.M., 220 N.J. at 233-34.  Thus, we will not "substitute [our] judgment for that of the trial court on this evidential ruling."  Id. at 234.

Here, the trial court examined the four factors in Rule 609(b)(2) regarding the convictions that were more than ten years old.  The court found that the first two factors were not applicable, but factors iii and iv—remoteness and seriousness of the crime—were.  As the Supreme Court held in Sands, "[t]he key to exclusion is remoteness," which "cannot ordinarily be determined by the passage of time alone" but also includes "the nature of the convictions" as "probably . . . a significant factor."  76 N.J. at 144.  Moreover, the trial court should consider whether "a defendant has an extensive prior criminal record," which "indicat[es] that he has contempt for the bounds of behavior placed on all citizens" as a

A-0941-22

jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen. If a person has been convicted of a series of crimes through the years, then conviction of the earliest crime, although committed many years before, as well as intervening convictions, should be admissible.

[Id. at 145.]

In support of his contention of error, defendant relies on State v. Higgs, 253 N.J. 333, 340 (2023), in which the defendant appealed from his conviction of the 2015 murder of his romantic partner. The trial court admitted five prior convictions: four convictions from 1993 for "second-degree aggravated assault; second-degree possession of a weapon for an unlawful purpose; third-degree distribution of CDS within 1,000 feet of a school zone; and second-degree possession of CDS" and one conviction from 2003 for third-degree unlawful possession of a weapon for which the defendant had received a probationary sentence. Id. at 347 n.2. Although these convictions were clearly more than ten years old at the time of trial, the trial court found that the defendant's 2009 conviction for the disorderly persons offense of simple assault "'bridged the gap' between the present case and [the] defendant's prior convictions," rendering those prior convictions admissible. Id. at 347.

The Supreme Court disagreed. Id. at 370. The Court stated that although Rule 609(b)(2)(i) allows the trial court to consider "intervening convictions" in determining whether to admit a remote conviction, the defendant's single intervening offense "which was not serious in nature" was not sufficient to apply that factor. Ibid. In addition, the Court noted the defendant's prior convictions did not involve "dishonesty, lack of veracity or fraud" under Rule 609(b)(2)(ii), although the prior offenses were undisputably both remote, Rule 609(b)(2)(iii), and serious, Rule 609(b)(2)(iv). Ibid. However, the Court held that "the seriousness of the prior convictions is not the only inquiry and cannot alone outweigh the prejudicial impact of remote convictions that have nothing to do with dishonesty." Ibid. Thus, the Court reversed the order admitting the defendant's convictions, holding that "the State did not meet its burden of establishing that the probative value outweighed the prejudicial effect of admitting the old convictions." Id. at 371.

We can easily distinguish Higgs from the circumstances presented here. The prejudicial effect versus probative value calculation is clearly different when weighing the prior convictions of a defendant such as Higgs, who led a relatively law-abiding life while at liberty (with the exception of a single simple assault charge) during the twelve years prior to the offense at issue. In contrast,

A-0941-22

defendant's lack of intervening convictions was due to his lengthy incarceration for his numerous prior convictions that ended only eighteen months prior to the murder of Rowe.

The trial court did not abuse its discretion in finding that defendant's showing of a "pattern" of "contempt for the bounds of behavior placed on all citizens" was relevant to the remoteness factor of Rule 609(b)(2)(iii). Aside from the three first-degree robbery convictions that defendant conceded were admissible, the other six convictions arose from six different criminal incidents, resulting in six separate indictments. Clearly, prior to his incarceration, defendant "repeatedly refuse[d] to comply with society's rules," weighing in favor of admitting his prior convictions. Sands, 76 N.J. at 145. We discern no abuse of discretion in the admission of all defendant's prior convictions.

## D.

We turn to defendant's assertion regarding the amended JOC. Defendant argues that the trial court's imposition of a new sentence for his murder conviction more than seventy-five days after his original sentence violated not only Rule 3:21-10(a), but also his constitutional right against double jeopardy.

The court first imposed sentence on February 17, 2022. With respect to defendant's first-degree murder conviction, the State requested that defendant

be sentenced to life in prison without the possibility of parole, asserting that defendant was eligible, because of his numerous prior convictions, for sentencing under the Three Strikes Law or as a persistent offender under N.J.S.A. 2C:44-3(a) or (d). The court reviewed the applicable aggravating and mitigating factors, finding aggravating factors three (the "risk that defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3)); six (the "extent of the defendant's prior criminal record and the seriousness of the offenses of which" he was convicted, N.J.S.A. 2C:44-1(a)(6)); and nine (the "need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9)) applied. The court found no mitigating factors.

In discussing count one, the court stated that

> there are really three ways . . . to impose a life sentence in this case. And the one is the . . . mandatory [sentence] under the three strikes law, N.J.S.A. 2C:43-7.1(a). Nobody's disputing that you have two first degree robberies. . . . [T]his would be the third strike. But there's also the second degree carjacking. But in any event, the two robberies get[] you to the third strike.
>
> There's also a legal basis to sentence [defendant] to an extended term [as] . . . being a persistent offender under 2C:44-3(a) or 2C:44-3(d), a second offender with [a] firearm. Now, the difference between the three strikes law and those provisions of the statute is in the parole ineligibility. Under three strikes it's life without parole mandatory. Under the other extended terms, it's life with a 35-year minimum parole ineligibility. And

> then there's, even if you weren't considered eligible for an extended term, just being convicted of murder. The range could be 30 years, up to life imprisonment. And life is, under the law, considered [to be] 75 years.

The court found that, even if the State had not applied for an extended term, it "would impose a life sentence . . . because it is warranted in this case" and "[t]he issue then becomes parole eligibility" and the court's "intention and what . . . is just and warranted, is that [defendant] not be eligible for parole." Therefore, the court sentenced defendant "under the three strikes law because it has to be clearly stated on the record, and that is [N.J.S.A.] 2C:43-7.1" to "life imprisonment without the possibility of parole on the murder charge."

The JOC issued February 26, 2022, stated, as to count one, that defendant "is committed to the Custody of the Commissioner of the Department of Corrections for a LIFE SENTENCE without the possibility of parole under the [Three] Strikes Law: N.J.S.A. 2C:43-7.1."

Defendant filed a Notice of Appeal in November 2022. Sometime later, the State Parole Board made a "request for clarification" to the court. The Parole Board noted that a defendant sentenced to life without parole under N.J.S.A. 2C:43-7.1 would still be eligible for parole if he was at least seventy years old and had served at least thirty-five years, while a defendant sentenced to a life sentence under NERA "must serve 85% of 75 years."

40

On July 7, 2023, the court issued an "amplification letter" to the Appellate Division regarding defendant's sentence on the murder conviction. The court stated:

> My intention was, and still is, that [d]efendant, whose record is atrocious, serve a sentence of life imprisonment without the possibility of parole. While it may have been inartfully stated, that was and remains the sentence I imposed. Essentially, I intended to sentence [d]efendant to the maximum sentence he could receive under the law—life (which equals seventy-five years), subject to NERA (85% which must be served before parole) pursuant to N.J.S.A 2C:43-7.2.
>
> I did reference the "three strikes" law because, given his prior record, there is no disputing that [d]efendant is eligible for a mandatory life sentence. I note that none of the sentencing memoranda or comments made at the sentencing hearing addressed paragraph "e" of N.J.S.A. 2C:43-7.1 which essentially modifies the heading "Life Imprisonment Without Parole" to allow for parole of a [d]efendant who reaches age seventy and has served thirty-five years in prison. I was remiss in overlooking that provision and I apologize for any confusion my oversight caused.

The July 7, 2023 amended JOC stated, as to count one, that defendant

> is committed to the Custody of the Commissioner of the Department of Corrections for a LIFE SENTENCE. Pursuant to [NERA] the defendant must serve eighty-five percent (85%) of the maximum term before being paroled. Upon defendant's release from prison, a FIVE (5) YEAR term of Parole Supervision is imposed.

41

Defendant does not dispute that, at the time of sentencing, he was eligible to be sentenced under either the Three Strikes Law (N.J.S.A. 2C:43-7.1) or NERA (N.J.S.A 2C:43-7.2). However, he contends the sentence is illegal under Rule 3:21-10(a) because under the Three Strikes Law, an eligible defendant convicted of first-degree murder, in violation of N.J.S.A. 2C:11-3, who has been "convicted of two or more" of the enumerated crimes, "shall be sentenced to a term of life imprisonment by the court, with no eligibility for parole." N.J.S.A. 2C:43-7.1(a). However, N.J.S.A. 2C:43-7.1(e) defines "a term of life" to "mean the natural life of a person sentenced pursuant to this section"

> [e]xcept that a defendant who is at least 70 years of age and who has served at least 35 years in prison pursuant to a sentence imposed under this section shall be released on parole if the full Parole Board determines that the defendant is not a danger to the safety of any other person or the community.

Under NERA, a "court imposing a sentence of incarceration for" an enumerated crime "shall fix a minimum term of 85% of the sentence imposed, during which the defendant shall not be eligible for parole." N.J.S.A 2C:43-7.2(a). "Solely for the purpose of calculating the minimum term of parole ineligibility pursuant to subsection a. of this section, a sentence of life imprisonment shall be deemed to be 75 years." N.J.S.A. 2C:43-7.2(b). Thus, as defendant was forty-one years old at the time of sentencing, he would have

been eligible for parole after serving thirty-five years of the life sentence imposed under the Three Strikes Law, but now will only be eligible for parole after serving sixty-three and three-quarters years of the life sentence imposed under NERA.

Under Rule 3:21-10(a), a court "may reduce or change a sentence, either on its own motion or on its own initiative, by order entered within [seventy-five] days from the date of the judgment of conviction and not thereafter."  "The time period provided by the rule is non-relaxable pursuant to R[ule] 1:3-4(c)." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 3:21-10 (2024).  The amended JOC here was issued well after this seventy-five-day deadline.

Moreover, the language "reduce or change" in the Rule "does not authorize a trial judge to increase a sentence previously imposed."  State v. Matlack, 49 N.J. 491, 500-01 (1967).  Thus, if defendant is correct that his sentence has been increased by the amended JOC, that action is not authorized by Rule 3:21-10(a) even if done within the permissible timeframe.  In addition, as defendant asserts, constitutional double jeopardy protections preclude any increase in sentence after defendant began serving his sentence.  See State v. Ryan, 86 N.J. 1, 9, 10-11 (1981) (noting "jeopardy attached as soon as defendant commenced serving his prison term"; thus; "once a sentence has gone into

operation, 'serious double jeopardy problems' would arise if the trial judge were permitted to increase that sentence" (quoting Matlack, 49 N.J. at 501)).

Although defendant's life sentence itself did not change, his period of parole ineligibility increased in the amended JOC by almost thirty years. Our courts have found it "fundamental that 'the basic sentencing issue is always the real time defendant must serve, and we have always recognized that real time is the realistic and practical measure of the punishment imposed.'" State v. Cooper, 402 N.J. Super. 110, 116 (App. Div. 2008) (quoting State v. Mosley, 335 N.J. Super. 144, 157 (App. Div. 2000)). Thus, "the imposition of a period of parole ineligibility which was not part of the original sentence would constitute an increased term." State v. Espino, 264 N.J. Super. 62, 67 (App. Div. 1993) (citing State v. Cruz, 125 N.J. 550 (1991); State v. Corbitt, 147 N.J. Super. 195, 200 (Law Div. 1977)).

The State argues that the amended JOC did not increase defendant's sentence but only clarified the earlier JOC based on the court's stated intention at the sentencing hearing that defendant "not be eligible for parole." The State is correct that the sentencing transcript, and not the JOC, controls. See State v. Walker, 322 N.J. Super. 535, 556 (App. Div. 1999) ("It is firmly established that

the sentencing transcript is 'the true source of the sentence.'" (quoting State v. Pohlabel, 40 N.J. Super. 416, 423 (App. Div. 1956))).

However, the sentencing transcript also clearly demonstrates that the trial court intended to sentence defendant "under the three strikes law . . . [N.J.S.A.] 2C:43-7.1." The court never mentioned sentencing defendant under NERA. Moreover, although the court stated its intent that defendant not be eligible for parole, both the Three Strikes Law and NERA permit defendant to be eligible for parole, albeit at different times. Therefore, there are too many inconsistencies between the transcript and the court's initial sentence and its later "clarification" for us to determine its legality and comportment with constitutional principles.

After the Parole Board sought clarification, the trial court should have convened the parties and conducted a hearing. We remand for it to do so now. In the sentencing hearing, the court must weigh its decision after a consideration of the parties' arguments in light of Rule 3:21-10(a), the mandatory nature of NERA sentencing, and the principles of defendant's constitutional double jeopardy rights.

We next address the points raised in defendant's pro se supplemental brief. We begin with defendant's contention that the trial court erred in not admitting a police report which defendant wished to use in cross-examining Szbanz.

Szbanz testified that he tackled defendant in front of 18 Ellsworth Avenue. During cross-examination, defense counsel sought to ask Szbanz about a "Trenton Police and Fire Event Report" also known as a "CAD report" that said "defendant was arrested . . . in front of 17 Ellsworth." The State objected on the grounds of hearsay since the CAD report had not been entered into evidence. Defense counsel argued the CAD report was admissible under both the business records and present sense impression hearsay exceptions.

Thereafter, defense counsel clarified that the statement recorded on the CAD report was made by Astbury. The court found that defense counsel had not laid a foundation to question Szbanz about the CAD report or to enter the report into evidence. However, counsel could call Astbury as a witness and question him about the report.

As stated, we review the trial court's evidentiary rulings for an abuse of discretion. Garcia, 245 N.J. at 430.

Defendant asserts the CAD report should have been admitted under N.J.R.E. 803(c)(2), the "excited utterance" exception to the rule against hearsay. That rule permits a hearsay statement to be admitted if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." R. 803(c)(2).

The CAD report does not contain any excited utterances. The statement about which defendant sought to question Szbanz was made after the events had occurred. Defendant was in custody, as Astbury related to the drafter of the report. Thus, this statement was a "narrative of past events" and could not be admitted without testimony from Astbury himself. State ex rel. J.A., 195 N.J. 324, 329 (2008). Although defendant subpoenaed Astbury, he ultimately chose not to call him as a witness. None of the recorded statements demonstrate any stress of excitement on the part of the speaker. Therefore, the excited utterance exception to the rule against hearsay does not apply.

F.

Defendant asserts, in Point II of his pro se supplemental brief, that the trial court erred in precluding admission of alleged evidence of Astbury's untruthfulness. During trial, defendant sought to impeach Astbury by referring

47

to a trial court's findings in a 2010 Law Division decision concerning Astbury's credibility regarding a search and seizure issue.

As the trial court here noted, the Law Division decision pointed out certain "inconsistenc[ies]" in Astbury's testimony that "another finder of fact might not think w[ere] inconsistent." The trial court here further noted that the 2010 decision "never said Astbury lied," and without that determination "you would need a trial within a trial" to determine Astbury's credibility. In addition, the 2010 decision was more than ten years prior, and was therefore "remote." As a result, the trial court found that "the probative value does not outweigh its prejudicial effect" and declined to admit the requested impeachment evidence.

N.J.R.E. 608 governs the admission of evidence of a witness's truthfulness or untruthfulness. Generally, except as provided in N.J.R.E. 609, or N.J.R.E. 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness' conduct in order to attack or support the witness' character for truthfulness." R. 608(c). However, "in a criminal case . . . the court may, on cross-examination, permit inquiry into specific instances of conduct that are probative of the character for truthfulness or untruthfulness of . . . the witness." R. 609(c)(1). "The proponent of the specific conduct inquiry . . . must show that: (1) a reasonable factual basis exists that the specific instance of conduct

occurred, and" it "has probative value in assessing the witness' character for truthfulness." R. 608(d). The court's determination whether to permit such inquiry

> is subject to the balancing standard of [Rule] 403. If, however, the specific instance of conduct occurred more than ten years before the commencement of the trial, the court must find that the probative value of the specific instance of conduct in assessing the witness' character for truthfulness outweighs any prejudicial effect.
>
> [R. 608(e).]

The unpublished case relied on by defendant involved the warrantless search and seizure by Astbury and other officers of a significant quantity of cocaine at a specific location in Trenton. The Law Division judge questioned the version of events presented by Astbury and other detectives.

As the trial court here correctly found, the 2010 opinion never specifically found that Astbury was untruthful. As the proponent of the impeachment evidence, defendant had the burden to show that "a reasonable factual basis exists that" Astbury was untruthful in the suppression matter. R. 608(d). Our limited factual findings precluded defendant from making such a showing. Therefore, we discern no abuse of discretion in the trial court's ruling that the

49

prejudicial effect of the allegations against Astbury in the suppression matter outweighed any probative value the allegations may have had.

G.

Next, defendant argues in his pro se supplemental brief that the trial court erred in reconsidering its ruling limiting expert testimony from the State's ballistics expert, and by not holding a Frye[5] hearing.

Prior to trial, defendant moved to preclude the State's ballistics expert testimony, asserting that Deady's "opinions are purely subjective" as he did "not use any reference materials" or "try to match bullet fragments and the shell casings to any other weapons." Defendant also argued that the State had not shown that the method Deady used "is sufficiently reliable" and that Deady only offered a "net opinion." The court denied defendant's motion.

During the trial, defendant moved to preclude Deady from saying that he was "reasonably certain" that the bullet or shell casing recovered came from the gun found after defendant's arrest. Instead, defendant requested Deady only testify that those things were "consistent" with that gun. Defendant relied on two federal district court cases. In granting defendant's motion, the court acknowledged that there were no briefs, expert reports or testimony regarding

---

[5] Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923).

the issue, so it was relying only on the presented case law. The court ruled that Deady was only permitted to say "consistent with being discharged from that pistol."

Thereafter, the State moved for reconsideration. In granting the motion, the court noted the federal court case law it had relied upon used the standard for reliability set forth in Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993), and not the Frye standard applicable in New Jersey. Instead, guided by State v. Ghigliotty, 463 N.J. Super. 355 (App. Div. 2020), and applying the Frye standard, the court held that the methodology utilized by Deady was "not novel" but "has been used for decades." Because this methodology had "gained . . . general acceptance in the particular field in which it belongs," the court allowed Deady to testify "without limitation as to his opinion." As the court noted, Deady would be subject to cross-examination regarding his opinions.

We "review a trial court's decision on a motion for reconsideration under an abuse of discretion standard." In re Estate of Jones, 477 N.J. Super. 203, 216 (App. Div. 2023) (citing Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015)).

Under N.J.R.E. 702, an expert who is qualified by knowledge, skill, experience, training, or education may testify in the form of an opinion if

scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence. The "well-known prerequisites" to this Rule are:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Hisenaj v. Kuehner, 194 N.J. 6, 15 (2008)].

At the time of this trial in 2021, New Jersey courts used "the Frye standard to assess reliability" for expert testimony in criminal cases. State v. J.L.G., 234 N.J. 265, 280 (2018) (citing Frye, 293 F. at 1014). Under this standard, the trial court must "determine whether the science underlying the proposed expert testimony has 'gained general acceptance in the particular field in which it belongs.'" Ibid. (quoting Frye, 293 F. at 1014). "[T]here are three ways to establish general acceptance under Frye: expert testimony, authoritative scientific and legal writings, and judicial opinions." Id. at 281 (citing State v. Townsend, 186 N.J. 473, 491 (2006)).

Recently, our Supreme Court held that, "going forward," the standard for scientific reliability set forth in Daubert, and not the "more restrictive" standard set forth in Frye, should apply to "the admissibility of expert evidence in criminal and quasi-criminal cases." State v. Olenowski, 253 N.J. 133, 139

52

(2023). The Daubert standard requires a trial court reviewing a proffer of expert scientific testimony to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 147 (quoting Daubert, 509 U.S. at 592-93). Daubert identified four "non-exclusive" factors to assist the trial court in making this assessment.

However, the Olenowski Court stated: "Nothing in today's decision disturbs prior rulings that were based on the Frye standard." Id. at 154. Moreover, the Court stated that when determining admissibility, "[j]udges may also continue to consider whether a principle is generally accepted by the scientific community." Id. at 152.

The trial court did not abuse its discretion in reviewing Deady's proposed expert testimony under the Frye standard, and in allowing such testimony. Its reliance on Ghigliotty was appropriate. There, we found "[t]he science of firearm and toolmark identification is well-established, spanning over 100 years in the United States." Ghigliotty, 463 N.J. Super. at 362 (citing Robert M. Thompson, Firearm Identification in the Forensic Science Laboratory (National District Attorneys Association, Alexandria, VA), 2010). "Neither the underlying principles nor the methodology has changed significantly during the

last 100 years" and, the "most widely accepted method used in conducting a toolmark examination is a side-by-side, microscopic comparison of the markings on a questioned material item to known source marks imparted by a tool[,]" as Deady did here.  Ibid. (quoting President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (Executive Office of the President), September 2016).

For the reasons stated, we affirm defendant's convictions but vacate the sentence and remand for a new sentencing hearing.

Affirmed in part, vacated in part, and remanded in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0941-22